Richard A. BATTERTON, Secretary of
Employment & Social Services of the
State of Maryland, Appellant,

v.

F. Ray MARSHALL, Secretary of
Labor, et al.

No. 78–1414.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 21, 1979.

Decided Aug. 28, 1980.

John K. Anderson, Asst. Atty. Gen., Baltimore, Md., member of the bar of the Supreme Court of Maryland pro hac vice by special leave of Court with whom Joel J. Rabin, Asst. Atty. Gen., Baltimore, Md., was on brief, for appellant.

Alice L. Mattice, Atty., Dept. of Justice, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on brief, for appellees. Mark N. Mutterperl, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for appellees.

Joel J. Rabin, Baltimore, Md., was on the brief for Amicus Curiae, Mayor and City Council of Baltimore, Maryland, supporting appellant's positions.

Before BAZELON, Senior Circuit Judge, ROBINSON, Circuit Judge, and VAN DUSEN *, U.S. Circuit Judge for the Third Circuit.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge:

This case poses the difficult but familiar problem of whether a particular agency action requires notice by publication and opportunity for comment by interested parties. The State of Maryland (Maryland)[1] alleges that the Department of Labor (DOL) violated procedural requirements in changing its methods for determining unemployment rates while implementing the Comprehensive Employment and Training Act (CETA).[2] CETA, as enacted and as amended, created training and job programs with fund disbursements pegged to unemployment levels determined by DOL's Bureau of Labor Statistics (BLS). We reverse the district court's grant of summary judgment for appellee DOL.

## I. BACKGROUND

Appellant Maryland administers the training and job programs funded by CETA and collects its state unemployment statistics for DOL. The amicus, representing the

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

1. Maryland is represented here by the Secretary of Employment and Social Services of the State and Chairman of the Maryland State Manpower Planning Council. An amicus brief filed by the Mayor and City Council of Baltimore, Maryland supports appellant Maryland. *See* p. 3 *infra*.

2. 29 U.S.C.A. §§ 801–992 (1975). CETA was substantially amended in 1978, Pub.L.No.95–524, 92 Stat. 1909 (codified at 29 U.S.C. §§ 801–899 (Supp. II 1979)). Those amendments do not affect the analysis or conclusions set forth in this opinion. Unless otherwise stated, all citations to CETA herein shall refer to the law applicable at the time the case was originally filed.

city of Baltimore, Maryland, is part of a combination of local government units established to administer CETA programs.[3] Appellees, officials of DOL, are responsible for administering CETA programs and for supervising the collection and computation of unemployment statistics used in allocating CETA monies.

CETA monies are distributed by the federal government to state and local sponsors of manpower training and services, public employment, and emergency job programs. The emergency job program established by Title VI of CETA disburses funds geographically by a formula in relation to the number of unemployed persons in particular locales.[4] "Unemployed persons" as defined by CETA are to be identified by "criteria used by the Bureau of Labor Statistics of the Department of Labor."[5]

Prior to the enactment of CETA in 1973, DOL generated unemployment statistics by applying a method that had evolved over time since the New Deal. Known as the "Handbook" method,[6] this approach draws on data collected by the nationwide network of state employment security agencies created under the Wagner–Peyser Act of 1933, 29 U.S.C. §§ 49 *et seq.* (1976). These state agencies maintain unemployment insurance data from which DOL developed

---

**3.** The City Council of Baltimore is a member of the Baltimore Metropolitan Manpower Consortium, established to serve as a prime sponsor under CETA, *see* 29 U.S.C.A. § 812(a)(3) (1975). For the purposes of CETA, appellant Maryland is a "prime sponsor" for 12 of the state's 24 counties. *See* 29 U.S.C.A. § 812 (1975).

**4.** Not less than 90% of funds appropriated under Title VI are to allocated according to the following formula:

(2)(A) Fifty per centum of the amount allotted under this subsection shall be allotted among eligible applicants in proportion to the relative number of unemployed persons who reside in areas within the jurisdiction of each such applicant as compared to the number of unemployed persons who reside in all such areas in all the States.

(B) Twenty–five per centum of the amount allotted under this subsection shall be allotted among eligible applicants in accordance with the number of unemployed persons residing in areas of substantial unemployment (as defined in section 844(c) of this title) within the jurisdiction of the applicant compared to the number of unemployed persons residing in all such areas.

(C) Twenty–five per centum of the amount allotted under this subsection shall be allotted among eligible applicants on the basis of the relative excess number of unemployed persons who reside within the jurisdiction of the applicant as compared to the total excess number of unemployed persons who reside within the jurisdiction of all eligible applicants. For purposes of this subparagraph, the term "excess number" means (i) the number which represents unemployed persons in excess of 4½ percentum of the labor force in the jurisdiction of the applicant in whose jurisdiction such persons reside or (ii), in the case of an applicant which is a State, the term "excess number" means such number as defined in clause (i) or the number which represents unemployed persons in excess of 4½ percentum of the labor force in areas eligible for assistance under subchapter II of this chapter located in the geographical area served by such State prime sponsor under subchapter I or II of this chapter, whichever is greater.

29 U.S.C.A. § 963(a)(2) (1975).

**5.** "Unemployed persons" means—

(A) persons who are without jobs and who want and are available for work; and

(B) . . . adults who or whose families receive supplemental security income . . . or would, as defined in regulations to be issued by the Secretary, be eligible for such payments but for the fact that both parents are present in the home (1) who are determined by the Secretary of Labor, in consultation with the Secretary of Health, Education, and Welfare, to be available for work, and (2) who are either (i) persons without jobs, or (ii) persons working in jobs providing insufficient income to enable such persons and their families to be self–supporting without welfare assistance;

and the determination of whether persons are without jobs shall be made in accordance with the criteria used by the Bureau of Labor Statistics of the Department of Labor in defining persons as unemployed, but such criteria shall not be applied differently on account of a person's previous employment.

29 U.S.C.A. § 981(a)(12) (1975).

**6.** This "Handbook" method was elaborated in handbooks used by DOL's Manpower Administration. Thus, it is also known as the "Manpower Administration" or "MA" method. For the purposes of this opinion, it is called the Handbook Method.

unemployment estimates.[7] DOL adopted a new methodology for collecting and computing unemployment statistics.[8] This method, devised by the DOL Bureau of Labor Statistics (BLS) relies on the state unemployment insurance data, collected under the Handbook Method, only where data from a preferred, second source are not available. This second source is the Current Population Survey (CPS) which is based on a monthly Census Bureau survey of a sample of households, drawn according to social science techniques. As survey data, however, CPS is not reliable for small numbers. So for areas with small populations, DOL continues to rely upon state unemployment insurance data, using the Handbook Method. To develop a composite figure for each state, DOL then combines the two sources of data, developed through the two different methods. This new method was never formally announced or published; DOL simply sent descriptive memo-randa announcing the change to regional commissions and state unemployment security agencies.[9]

In 1974, Congress added Title VI to CETA which created a nationwide emergency jobs program as a direct response to the nation's "deteriorating economic condition."[10] As these Title VI disbursements were being computed in 1975, DOL, again without formal notice, notified the regional office supervising Maryland that another new procedure in the unemployment statistics methodology would apply to Maryland.[11] Called the "Balance of State" procedure, it adjusts the Handbook Method estimate where its addition to the state's CPS data fails to match a total benchmark figure for the state, set solely by national CPS data.[12] DOL then applied the Balance of State procedure to adjust the unemployment statistics submitted by Maryland—and the Fiscal 1976 CETA allotments based on the statistics.[13]

7. Pursuant to the Social Security Act, 42 U.S.C. § 503 (1976) and the Federal Unemployment Tax Act, 26 U.S.C. § 3304 (1976), these state agencies are required to maintain unemployment insurance data.

8. The following description relies on "Statement of Reasons by the Assistant Commission for the Bureau of Labor Statistics (BLS) As to Why the 'Balance of State' Procedures were Used by BLS In Estimating the Rates of Unemployment for the Areas Represented by the Western Maryland Consoria and the Balance of State Prime Sponsor" [hereinafter cited as Statement of Reasons]. It was submitted to the district court and included as an addendum to appellee's brief.

DOL reported that criticism of the Handbook Method contributed to the decision to adopt a new one. Statement of Reasons at 3a–4a (citing report of President's Committee to Appraise Employment and Unemployment Statistics (1962)).

9. The first BLS memorandum, dated Nov. 1, 1973, described the method and set its implementation for January, 1974. Additional memoranda were dated Dec. 21, 1973; Jan. 30, 1974; Feb. 26, 1974; and Dec. 20, 1974. BLS also conducted training programs for the state employment security agencies that provide the Handbook Method estimates based on the state unemployment insurance data.

10. H.R.Rep. No. 93–1528, 93rd Cong., 2d Sess. 1 (1974), U.S.Code Cong. & Admin.News 1974, p. 6756 (describing Emergency Jobs and Unem-ployment Assistance Act of 1974, Pub.L. No. 93–567, 88 Stat. 2117, codified at 29 U.S.C.A. §§ 961–66 (1975)).

11. Maryland avers that it became aware of this application of the Balance of State procedure only indirectly—through a telegram to the Regional Office from DOL and through a memorandum to Maryland state officials from the Regional Office. Amended Complaint, ¶ 22, reprinted in Appendix (App.) at 14.

12. DOL reported that the Balance of State procedure is necessary only in a few states where a CPS state–wide total estimate diverged from the sum of the CPS estimates for a few counties with the non–CPS, Handbook estimates for remaining areas. As DOL explained, "[e]ffectively, the Balance of State procedure amounts to a proportionate reduction (or increase) in the number (estimate) of unemployed in the non–CPS areas to that extent necessary to equal the difference between the CPS–derived statewide total estimate and the sum of the CPS intra–state estimates." Statement of Reasons at 8a. DOL also explained that it decided to "distribute the error"; that is, to effect the necessary adjustment among only the non–CPS estimates as it found the CPS estimates in general more reliable. *Id.*

13. Telegram from Martin Ziegler, DOL, Washington, D.C., to Frederick Bauer, DOL, Philadelphia (Jan. 7, 1975) (central office directing region to direct Maryland to revise unemploy-

Maryland then filed this suit for declaratory and injunctive relief. For the purposes of this litigation, Maryland estimated that application of the "Balance of State" procedure significantly reduced its share of Title VI CETA monies.[14] Maryland alleged (1) violations of publication requirements set by CETA and by the Freedom of Information Act (FOIA);[15] (2) violations of the Administrative Procedure Act's (APA) notice and comment requirements for rulemaking;[16] and (3) that the new method for computing unemployment statistics is arbitrary and capricious.

On summary judgment motions, the district court ruled that no procedural defect occurred in DOL's adoption of the new method, including the Balance of State procedure because (1) Congress did not explicitly require notice and comment opportunities or publication of unemployment statistics methodology; (2) such procedural requirements could interrupt the necessary gathering of statistics; (3) DOL's practice of gathering unemployment statistics occurred long before CETA, and the mere creation of CETA does not change the procedures for adopting methods of gathering unemployment statistics; and (4) adoption of the new method does not constitute a rule for the purposes of APA procedural requirements.[17] The district court also held that there was a rational basis for the new method, and accordingly ordered summary judgment for the Department of Labor.

## II. JUSTICIABILITY

To the extent that Maryland challenges DOL's allocation of funds for fiscal year 1976, this appeal appears to be moot; not only were the monies allocated and spent long ago, but Maryland also received extra funds, pursuant to DOL's discretionary authority, that amounted to more than the reduction Maryland estimated from application of the new methodology.[18] Nonetheless, Maryland also sought injunctive relief requiring advance notice and publication of any future modifications of the statistical methodology.[19] Moreover, changes by DOL in its methodology for determining unemployment figures used in CETA disbursements are "capable of repetition, yet evading review."[20] Therefore, we proceed with our review.

## III. CHARACTERIZING THE AGENCY ACTION

Appellant argues that DOL's methodology for developing unemployment statistics constitutes a "rule," requiring notice and comment.[21] We note that so holding can also affect the weight the agency action must be given in future agency practice and

ment estimates by using Balance of State procedure); Memorandum from Frederick Bauer and Rosa Bacon, Regional BLS, to George Widman, Cooperating Representative (Jan. 8, 1975) (giving new Maryland estimates using Balance of State procedure).

14. Maryland estimated that application of the balance of State procedure reduced nondiscretionary Title VI funds for the entire state from $2,359,336 to $979,116, reducing the authorized number of jobs from 294 to 122. *See* Amended Complaint ¶ 25, App. at 17–18. Maryland estimated that the 12 counties for which it is a CETA prime sponsor lost $386,697, or 48 jobs through the application of the "Balance of State" procedure. *Id.*

15. *See* 5 U.S.C. § 552 (1976).

16. *See* 5 U.S.C. § 553 (1976).

17. Memorandum Opinion, App. 33–35.

18. Amended Complaint ¶ 24, App. at 16.

19. Maryland asked the district court to (1) order DOL to publish each year in the Federal Register the allotments under Title I and employment rates used under Title II; (2) prohibit DOL from using the "balance of state" procedure in Maryland; (3) declare changes in methods for determining unemployment rates in connection with CETA fund disbursement to be formal rulemaking under the APA; (4) order DOL to comply with APA formal rulemaking procedures in adopting methods for computing employment rates in connection with CETA fund disbursement; (5) declare that such methods must be published in the Federal Register pursuant to FOIA; and (6) order such publication. Amended Complaint, ¶¶ C–H, App. at 20–21.

20. *See Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

21. Appellant's Br. at 1, 7, 12, 13–19.

upon judicial review.[22] Our task is therefore a familiar one—that of characterizing the product of agency action to determine its legal status and effect.

Our task is particularly difficult because, ordinarily, a methodology related to disbursement of government benefits would fall outside the APA. Section 553 explicitly exempts from all procedural requirements "a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2) (1976). Here, however, DOL has expressly waived this exemption by its own regulation which provides:

It is the policy of the Secretary of Labor that in applying the rule making provisions of the APA the exemption therein for rules relating to public property, loans, grants, benefits or contracts shall not be relied upon as a reason for not complying with the notice and public participation requirements thereof.[23]

As a result, the APA's examples, and judicial precedents interpreting them, do not speak directly to the case at hand. Our decision therefore must be based on the purposes and language of the APA, and on analysis of each of the relevant exemptions. Finally, we consider residual arguments proffered by the parties.

A. *Purposes Behind Informal Rulemaking Procedures*

The Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.*, broadly defines an agency rule to include nearly every statement an agency may make:

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing[.]

5 U.S.C. § 551(4) (1976). The breadth of this definition cannot be gainsaid. The APA further defines "rule making" to mean "agency process for formulating, amending, or repealing a rule," 5 U.S.C. § 551(5) (1976), and prescribes procedural requirements for these processes. Rulemaking must be accompanied by (1) advance publication in the Federal Register of the proposed rule or its substance; (2) opportunity for public participation through submission of written comments, with or without oral presentation; and (3) publication of the final rule, incorporating a concise statement of its basis and purpose, thirty days before its effective date.[24]

█ In keeping with the general commitment to public notice and participation, the

---

**22.** *Joseph v. United States Civil Service Comm'n*, 554 F.2d 1140, 1153 n. 24 (D.C.Cir. 1977).

**23.** 29 C.F.R. § 2.7 (1979) (promulgated at 36 Fed.Reg. 12976 July 10, 1971)). Agencies have discretion to add to the procedural requirements designated by Congress. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543–44, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978). Indeed, exemptions to § 553 are not "to be taken as encouraging agencies not to adopt voluntary rule–making procedures where useful to the agency or beneficial to the public." H.R.Rep. No. 1980, 79th Cong., 2d Sess. 256 (1946), *reprinted in* Administrative Procedure Act—Legislative History, S.Doc. No. 248, 79th Cong., 2d Sess. (1946).

**24.** Section 553 of the APA reads in full as follows:

§ 553. Rule making
 (a) This section applies, according to the provisions thereof, except to the extent that there is involved–
 (1) a military or foreign affairs function of the United States; or
 (2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.
 (b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include–
 (1) a statement of the time, place, and nature of public rule making proceedings;
 (2) reference to the legal authority under which the rule is proposed; and

APA provides only limited exceptions to these requirements.[25] Advance publication and opportunity for public participation applies to all rules except "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."[26] Final publication or service, thirty days prior to the rule's effective date, applies even to rules of agency organization, procedure, or practice, but is not required for "interpretative rules and statements of policy."[27]

These provisions separate administrative rules that carry the force of law from those that do not. Advance notice and public participation are required for those actions that carry the force of law. These "legislative" or "substantive" rules can be issued only if Congress has delegated to the agency the power to promulgate binding regulations in the relevant area.[28] Legislative rules thus implement congressional intent; they effectuate statutory purposes.[29] In so doing, they grant rights,

> (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.
> Except when notice or hearing is required by statute, this subsection does not apply—
> (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
> (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.
> (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.
> (d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—
> (1) a substantive rule which grants or recognizes an exemption or relieves a restriction;
> (2) interpretative rules and statements of policy; or
> (3) as otherwise provided by the agency for good cause found and published with the rule.
> (e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.
> 5 U.S.C. § 553 (1976).

**25.** *See Center for Auto Safety v. Tiemann*, 414 F.Supp. 215 (D.D.C. 1976) (exemptions to be construed narrowly); S.Doc.No. 248, 79th Cong., 2d Sess. 19, 199 (1946) (exceptions must not swallow requirements of § 553).

Of course, agency action that clearly falls outside the definition of a "rule" is also freed from rulemaking procedures, but may be subject to other requirements. *E.g., Marshall v. Barlow's Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (warrant required for agency inspection); 5 U.S.C. § 554 (1976) (adjudication).

**26.** 5 U.S.C. § 553(b)(3)(A) (1976). The APA also permits a "good cause" exception to the required advance notice and opportunity for comment. 5 U.S.C. § 553(b)(3)(B) (1976).

**27.** 5 U.S.C. § 553(d)(2) (1976). The required advance publication or service may also be avoided "for good cause found and published with the rule," 5 U.S.C. § 553(d)(3) (1976), and for "a substantive rule which grants or recognizes an exemption or relieves a restriction." 5 U.S.C. § 553(d)(1) (1976). These two other exceptions are not relevant here.

**28.** *Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 873 (D.C. Cir. 1979); *Joseph v. United States Civil Service Comm'n*, 554 F.2d 1140, 1153 n.24 (D.C. Cir. 1977). The addition of participatory procedures by an agency may still be warranted to inform the agency and give the public a sense of fair consideration. Such a course would also avoid litigation where the requisite procedures are subject to debate. *Guardian Federal Savings and Loan Ass'n v. Federal Savings and Loan Insurance Corp.*, 589 F.2d 658, 669 (D.C. Cir. 1978). As the Senate Committee reporting the APA announced, "[n]one of the exceptions . . . is to be taken as encouraging agencies not to adopt voluntary public rule making procedures where useful to the agency or beneficial to the public." Report of the Senate Judiciary Committee on the Administrative Procedure Act, S. Rep. No. 752, 79th Cong., 1st Sess. 13 (1945), *reprinted in* S. Doc. No. 248, 79th Cong., 2d Sess. 199 (1946).

**29.** *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952) (legislative rules create law "implementary to existing law"). Legislative rules differ significantly from agency action

impose obligations, or produce other significant effects on private interests.[30] They also narrowly constrict the discretion of agency officials [31] by largely determining the issue addressed. Finally, legislative rules have substantive legal effect. They cannot be set aside by the courts unless found "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976).[32]

 Non–binding action, in contrast, merely expresses an agency's interpretation, policy, or internal practice or procedure. Such actions or statements are not determinative of issues or rights addressed.[33] They express the agency's intended course of action, its tentative view of the meaning of a particular statutory term, or internal house-keeping measures organizing agency activities. They do not, however, foreclose alternate courses of action or conclusively affect rights of private parties.[34] Although an agency empowered to enact legislative rules may choose to issue non–legislative statements, an agency without legislative rulemaking authority may issue only non–binding statements.[35] Unlike legislative rules, non–binding agency statements carry no more weight on judicial review than their inherent persuasiveness commands.[36]

We would be less than candid if we pretended that the labels of "legislative" and "non–binding" rules neatly place particular agency actions within any particular category. Instead, the categories have "fuzzy perimeters" [37] and establish "no general formula." [38] The wouldbe cataloguer may be

that merely reminds parties of *existing* duties. *Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 876 n.153 (D.C. Cir. 1979); *Yale Broadcasting Co. v. FCC*, 478 F.2d 594, 599 (D.C. Cir. 1973).

30. The rights, conduct, obligations, and interests affected by legislative, binding rules cover a broad range. *See, e. g., Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 877–78 (D.C. Cir. 1979) (rule providing "guidance to states on how to incorporate into state implementation plans the comprehensive set of new . . . regulations" prescribed by statute); *Joseph v. United States Civil Service Comm'n*, 554 F.2d 1140, 1153 (D.C. Cir. 1977) (regulation granting exemptions from Hatch Act); *Nader v. Butterfield*, 373 F.Supp. 1175, 1178 (D.D.C. 1974) (memorandum approving " 'use of x–ray systems for hand–carried luggage/items inspection' " at airport).

31. *See Guardian Federal Savings and Loan Ass'n v. Federal Savings and Loan Insurance Corp.*, 589 F.2d 658, 666 (D.C. Cir. 1978); *Pickus v. United States Board of Parole*, 507 F.2d 1107, 1112 (D.C. Cir. 1974); *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974).

32. *Batterton v. Francis*, 432 U.S. 416, 425–26, 97 S.Ct. 2399, 2405–06, 53 L.Ed.2d 448 (1977); *Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 889 (D.C. Cir. 1979). *See generally* K. Davis, 2 Administrative Law Treatise § 7.13 (1979).

33. *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974).

34. "Policy Statements" announce an agency's intended future course or area for exploration,

see, e. g., *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974). An "interpretative rule" describes the agency's view of the meaning of an existing statute or regulation. *Yale Broadcasting Co. v. FCC*, 478 F.2d 594, 599 (D.C. Cir. 1973); *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952). An internal agency "practice or procedure" is primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights of interests of affected parties. *See, e. g., Guardian Federal Savings and Loan Ass'n v. Federal Savings and Loan Insurance Corp.*, 589 F.2d 658, 665 (D.C. Cir. 1978) (rule directing that required audits be performed by non–government auditors); *Kessler v. FCC*, 326 F.2d 673, 680–82 (D.C. Cir. 1963) (freeze on acceptance of applications); *Ranger v. FCC*, 294 F.2d 240, 243 (D.C. Cir. 1961) (cut–off date).

35. *Joseph v. United States Civil Service Comm'n*, 554 F.2d 1140, 1154 n.26 (D.C. Cir. 1977).

36. *General Electric Co. v. Gilbert*, 429 U.S. 125, 141, 97 S.Ct. 401, 410, 50 L.Ed.2d 343 (1976).

37. *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974). *See also id.* at 37 ("Professor Davis has described the distinction between substantive rules and general statements of policy as a 'fuzzy product.' ") (footnote omitted); *Chamber of Commerce v. OSHA*, 636 F.2d 464 at 471 (D.C. Cir. 1980) (Bazelon, J.).

38. F. Cooper, Administrative Agencies and the Courts 87 (1951).

confounded by the wide variation in kinds of agency action, and the diverse contexts of regulatory fields. Agencies not only prescribe standards for acceptable conduct,[39] but also establish incentives for desired conduct,[40] and grapple with some of the most fundamental value conflicts of our era.[41] Agencies give advice, enter contracts, stimulate inventions, and approve rates.[42] Agencies also alleviate burdens,[43] allocate funds,[44] and issue statements guiding the exercise of such functions.[45] Particular actions combine the qualities of interpretative rules, policies, internal procedures, and leg-

islative rules.[46] Thus, their legal characterization cannot be accomplished merely by asking if a given agency action *is* one or another of such thing.

Analysis that improves upon semantic play must focus on the underlying purposes of the procedural requirements at issue. The essential purpose of according § 553 notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies.[47] As the Third Circuit articulat-

**39.** *See, e. g.,* Equal Credit Opportunity Act, 15 U.S.C. § 1691b (1976) (empowering Federal Reserve Board to issue regulations to prohibit discriminatory credit practices); Motor Vehicle Information and Cost Savings Act, 15 U.S.C. § 2002(a)(3) (1976) (directing Secretary of Transportation to prescribe average fuel economy standards for passenger automobiles); Clean Air Act, 42 U.S.C. § 7408(a)(1) (Supp. II 1979) (directing Environmental Protection Agency to establish national ambient air quality standards).

**40.** The use of tax exemptions or credits is the most obvious form of agency incentive. *See, e. g., Eastern Kentucky Welfare Rights Org. v. Simon,* 506 F.2d 1278, 1291 (D.C. Cir. 1974) (Wright, J., concurring in part and dissenting in part), *vacated on other grounds,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

**41.** *See, e. g., Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (agency considers disposal of nuclear wastes); *Wilderness Society v. Morton,* 479 F.2d 842 (D.C. Cir.) (en banc), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973) (agency considers ecological effects of building oil pipeline across Alaskan tundra); *Environmental Defense Fund, Inc. v. Ruckelshaus,* 439 F.2d 584 (D.C. Cir. 1971) (agency considers ban on DDT).

**42.** *See American President Lines v. Federal Maritime Comm'n,* 316 F.2d 419 (D.C. Cir. 1963) (opinion of legal staff); *Essex Chemical Corp. v. Ruckelshaus,* 486 F.2d 427, 433 (D.C. Cir. 1973), *cert. denied, Appalachian Power Co. v. Environmental Protection Agency,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974) (private innovation stimulated to achieve air quality standards); Bonfield, *Public Participation in Federal Relating to Public Property, Loans, Grants, Benefits, or Contracts,* 118 U.Pa.L.Rev. 540 (1970) (range of agency activities); *Public Service Co. of New Hampshire v. FERC,* 600 F.2d 944 (D.C. Cir. 1979) (Federal Power Commission disapproves electric companies' proposed rate surcharges).

**43.** *See Pickus v. United States Board of Parole,* 507 F.2d 1107 (D.C. Cir. 1974) (Parole Board grants parole to eligible federal prisoners).

**44.** The emergency job program under CETA is a typical example of fund allocation to intermediate bodies. Of course, agencies also disburse funds to individuals. *See, e. g., Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (disability benefits).

**45.** *See, e.g., Lewis v. Weinberger,* 415 F.Supp. 652 (D.N. Mex. 1976) (regulations governing delivery of medical care to American Indians and Alaskan Natives).

**46.** For example, in *Eastern Kentucky Welfare Rights Org. v. Simon,* 506 F.2d 1278 (D.C. Cir. 1974), *vacated,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), this court considered an Internal Revenue Service ruling modifying the requirement that private non–profit hospitals seeking tax exempt status provide low cost treatment to individuals unable to pay. The revenue ruling did in fact interpret the meaning of the word "charitable" under § 501(c)(3) of the Internal Revenue Code. 506 F.2d 1278, 1290 (D.C. Cir. 1974). Nonetheless, the ruling certainly would significantly alter the availability of hospital services for those unable to pay. *See* 506 F.2d at 1291 (Wright, J., concurring in part and dissenting in part). In addition, the court reviewed the ruling only for its reasonableness, not *de novo,* and thereby acknowledged the authoritative quality of the IRS ruling. 506 F.2d at 1292–93 (Statement of Bazelon, C.J., as to why he voted to grant rehearing *en banc*).

**47.** The legislative history of the APA explicitly states that due to the unrepresentative nature of an administrative agency, "public participation . . . in the rulemaking process is essential in order to permit administrative agencies to inform themselves, and to afford safeguards to private interests." S. Doc. No. 248, 79th Cong., 2d Sess. 19–20 (1946). *See*

ed, "Section 553 was enacted to give the public an opportunity to participate in the rule–making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated." [48]

To advance these purposes, the APA broadly defines rules subject to § 553 procedures, and carves out only limited exceptions. [49] Exemptions should be recognized only where the need for public participation is overcome by good cause to suspend it, [50] or where the need is too small to warrant it, as for example, when the action in fact does not conclusively bind the agency, the court, or affected private parties. [51] With these considerations in mind, we analyze the statistical methodology at issue here.

### B. *Is the Methodology a "Rule"?*

DOL argues that "the statistical methodology at issue here is not a 'rule'" because it "is not a 'statement designed to imple-

ment, interpret, or prescribe law or policy'; it is a method for gathering the data on which such implementation, interpretation, or prescription–e. g., the actual allocations of CETA funds–is based." [52] This reasoning fails to take adequate account of the relevant statutes and the practical purpose of the methodology.

The statutory formulation for allocating emergency job monies specifically requires use of the BLS criteria in defining persons as unemployed. [53] The Secretary is authorized and directed under 29 U.S.C. § 882(b) to "develop reliable methods, including the use of selected sample surveys, to produce more statistically accurate data on unemployment." [54] The adoption of such methods clearly implements these statutory provisions.

Nonetheless, DOL argues that the gathering of unemployment statistics–and the methods prescribed for that purpose–entail merely investigatory steps which are not rules under the APA. [55] Thus, DOL relies on a statement in a 1958 treatise, written

---

Attorney General's Comm. on Administrative Procedure, Administrative Procedure in Government Agencies 108 (1941).

**48.** *Texaco, Inc. v. FPC*, 412 F.2d 740, 744 (3d Cir. 1969).

**49.** *See* pp. 700–701 *supra*.

**50.** 5 U.S.C. § 553(b)(3)(B) (1976); 5 U.S.C. § 553(d)(3) (1976).

**51.** Interpretative rules exempted from the notice, comment, and advance publication requirements, 5 U.S.C. § 553(b)(3)(A); 5 U.S.C. § 553(d)(2) (1976), are not determinative of the rights or interests of parties because they merely intepret or restate a prior existing law or rule. *See* pp. 702 *supra*, 705 *infra*. General statements of policy, also exempted from § 553 requirements are not determinative of private rights or interests because the statements leave room for agency discretion and *de novo* review by the courts. *See* p. 706 *infra*. Also exempted are rules of agency organization, procedure, or practice which by definition do not determine private rights or interests. *See* 707 *infra*. *See also* Reich, *Rule Making Under the Administrative Procedure Act*, in The Federal Administrative Procedure Act and the Agencies 492, 516 (G. Warner, ed. 1947) (New York University Institute Proceedings).

**52.** Appellee's Br. at 25–26.

**53.** 29 U.S.C.A. § 981(a)(12)(B) (1975).

**54.** The Secretary is also authorized and directed to "develop a comprehensive system of labor market information on a national, State, local, or other appropriate basis." 29 U.S.C.A. § 882(a) (1975). *See also* n.60 *infra*.

**55.** Appellee's Br. at 26. DOL mistakenly analogizes the statistical methodology to the financial performance reports at issue in *Appeal of FTC Line of Business Report Litigation*, 595 F.2d 685 (D.C. Cir.), *cert. denied sub nom. Milliken & Co. v. FTC*, 439 U.S. 958, 99 S.Ct. 362, 58 L.Ed.2d 351 (1978). The latter case involved "'the compulsory action of administrative agencies when they issue subpoenas, require records or reports, or undertake mandatory inspections.'" 595 F.2d at 696 (quoting 92 Cong. Rec. 5648 (1948) (remarks of Rep. Walter on APA)). For it to provide an analogy here, appellants would have to be challenging the requirement that local unemployment records be submitted to DOL, rather than the statistical methodology by which DOL develops estimates for CETA allocations and other purposes. Because this methodology is by statute put to regulatory use, 29 U.S.C.A. § 981(a)(12) (1975), and because it prescribes the required steps rather than merely suggesting or encouraging them, the methodology carries exactly the kind of purpose and effect we found lacking in *Appeal of FTC Line of Business Report Litigation*, 595 F.2d at 695 n.48.

long before CETA, that identified the collection and analysis of materials by BLS as investigatory activity.[56] This reliance on pre–CETA analysis is surely misplaced, since the critical question is whether the passage of CETA changed the import of DOL's action in developing statistics.

As the district court observed, unemployment statistics were gathered long before CETA.[57] The passage of CETA, however, transformed them into the critical factor in an otherwise inflexible statutory formula for allocating monies. Therefore, the development of statistics no longer serves merely informational purposes, nor does it simply assist preliminary determinations prior to taking effective agency action. Instead, the chain of agency actions leading to allocation of funds under the emergency job program provides for agency discretion at only one link: the selection of statistical methodology for collecting and analyzing unemployment data. This certainly places DOL's selection of a statistical methodology within the APA's broad definition of rule as "an agency statement . . . designed to implement . . . law." [58]

### C. Is It an "Interpretative Rule?"

■ As its name suggest, an "interpretive rule" is an agency statement interpreting an existing statute or rule. *Guardian Federal Savings and Loan Ass'n v. Federal Savings and Loan Insurance Corp.*, 589 F.2d 658, 664 (D.C. Cir. 1978). An interpretative rule serves an advisory function explaining the meaning given by the agency to a particular word or phrase in a statute or rule it administers. As this court explained in *Gibson Wine Co. v. Snyder*, 194 F.2d 329 (D.C. Cir. 1952):

> An interpretative rule is one which does not have the full force and effect of a substantive rule but which is in the form of an explanation of particular terms in an Act. If you had an expression in a statute such as "Interurban Railway," the query might come. up as to what is an "interurban railway." A particular agency may adopt a rule defining an interurban railway. That, in a sense, may be called an interpretative rule.

■ Where the rule at issue is not authorized by a relevant statutory delegation, it can only be considered an interpretative rule regardless of its form or scope.[59] Here, however, the agency enjoys delegated authority to prescribe rules with the force of law concerning the development of unemployment statistics.[60] The methodology is not merely an interpretation of statutory

---

**56.** Appellee's Br. at 26. (citing K. Davis, Administrative Law Treatise § 3.02 at 163 (1958)).

**57.** Memorandum Op., App. 29, 30, 32, 34. The mere fact of a longstanding practice of acting without rulemaking does not determine whether the agency is in fact authorized to perform rulemaking. *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672 (D.C. Cir. 1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1979). Thus, we are not persuaded by the district's reasoning, see Memorandum Op., App. 34, that DOL's long standing practice of using a methodology for developing unemployment statistics, without following rulemaking procedures, concludes the question of whether the function requires such procedures. Moreover, the intervening passage of CETA changes the use and import of the methodology.

**58.** 5 U.S.C. § 551(4) (1976). *See* p. 700 *supra* (quoting provision in full). Where necessary, the court will look behind the particular label applied by the agency to challenge action in order to discern its real intent and effect. *See Chamber of Commerce v. OSHA*, 636 F.2d 464,

at 468 (D.C. Cir. 1980); *Nat'l Motor Freight Traffic Ass'n v. United States*, 268 F.Supp. 90, 95 (D.D.C. 1967), aff'd, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968). *See also Nat'l Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, 696 (2d Cir. 1975) (label alone does not determine whether agency action is authoritative).

**59.** *Joseph v. United States Civil Service Comm'n*, 554 F.2d 1140, 1154 n.26 (D.C.Cir. 1977).

**60.** *See* p. 704 *supra* (discussing DOL's statutory authority to develop and use statistics). Furthermore, 29 U.S.C. § 982 delegates general rulemaking authority to DOL under CETA. The section's definition of a "rule" that must be subject to § 553 procedures includes "any condition or guideline for receipt of financial assistance." DOL argues that the methodology is not a "condition or guideline." The only support for this claim is that the statistical methodology is not listed among the eligibility "conditions" named in section 983 of CETA. We see no reason not to find the methodology,

language because it actually prescribes the regulatory structure through which the critical variable in the CETA formula is attained.

█ In this manner, the statistical methodology here resembles the regulations at issue in *Pharmaceutical Manufacturers Ass'n v. Finch*, 307 F.Supp. 858 (D.Del. 1970). There the Commissioner of Food and Drugs promulgated standards detailing criteria for " 'adequate and well–controlled clinical investigations' " deemed necessary for "substantial evidence" of effectiveness needed for the Commissioner to approve applications to market new drugs.[61] Because the criteria so conclusively determined the nature of satisfactory tests needed to obtain the Commissioner's approval for new drugs, the district court in Delaware found that the regulations were not interpretative and required application of § 553 procedures.[62] Similarly, DOL's methodology conclusively determines the unemployment statistics which trigger the emergency job program allocations. As DOL is authorized to promulgate legislative rules governing unemployment statistics, its determinative action to do so cannot be merely an interpretative rule under § 553.

### D. *Is It a "General Policy Statement"?*

█ Another exception to § 553 notice and comment procedures falls under the label, "general policy statement." As this court articulated in *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 38 (D.C.Cir.1974) (footnote omitted),

which determines the critical factor used in CETA allocations, covered by the remaining term of "guideline" included in 29 U.S.C. § 982. We find that the methodology, when used for CETA purposes, fits under the definition of a rule found in the general delegation of rulemaking authority under CETA.

DOL also points to the absence of references to rulemaking procedures in CETA's provisions on the methodology compared with CETA's explicit references to publication and rulemaking in other provisions. Appellee's Br. at 19. DOL argues that this indicates a deliberate congressional decision to avoid APA procedures in the adoption of the statistical methodology.

A general statement of policy is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications. A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications."

The statistical methodology at issue here does not merely represent DOL's future intention. It presents the course the agency has selected and followed, resulting in significant changes from the previous method.[63] Moreover, the statistical methodology leaves no room for further exercise of administrative discretion. As described above, it is determinative of DOL's analysis in allocating CETA funds under the emergency job program.

In this respect, the methodology significantly differs from the general statement of policy in *Guardian Federal Savings and Loan Ass'n v. Federal Savings and Loan Insurance Corp., supra.* The regulation at issue there prescribed criteria for audits of Savings and Loan Associations to satisfy the Federal Savings and Loan Insurance Corporation. Because the regulations granted the agency discretion to accept even non–conforming audit reports, this court found the regulations to be a general statement of policy, rather than a binding rule requiring notice and comment.[64] The Secretary of Labor retains no such discretion here.

We are not persuaded. If omission of procedural references in the language of specific provisions were determinative, the general directive for rulemaking in 29 U.S.C. § 982 would be superfluous, which cannot have been the intent of Congress.

**61.** 307 F.Supp. at 859 (quoting regulation).

**62.** *Id.* at 864.

**63.** *See* p. 699 & n.14 *supra.*

**64.** 589 F.2d at 666. *See American Bus Ass'n v. ICC*, 627 F.2d 525, at 529 (D.C. Cir. 1980).

DOL's statistical methodology bears a clear resemblance to the parole guidelines contested in *Pickus v. United States Board of Parole*, 507 F.2d 1107 (D.C.Cir.1974). There, the Parole Board published guidelines specifying factors it considers in exercising its discretion to parole eligible federal prisoners. This court rejected the Board's argument that such guidelines were merely a general statement of policy because, "formula like," [65] they effectively directed the focus of the Board's discretionary judgment. Because the guidelines "define a fairly tight framework to circumscribe the Board's statutorily broad power," we found they could not be exempted from the notice and comment provisions of § 553.[66] We reach the same conclusion here, for the statistical methodology at issue *is* a formula, and leaves no discretion to weigh or alter the contributing elements.

### E. Is It a "Rule of Agency Organization, Procedure, or Practice"?

The final characterization that could remove the statistical methodology from § 553 requirements may be the hardest to define. Labeled by the APA as a "rule of agency organization, procedure, or practice," [67] this exception was provided to ensure that agencies retain latitude in organizing their internal operations.[68]

The problem with applying the exception is that many merely internal agency practices affect parties outside the agency—often in significant ways. As Professor Freund explained decades ago, "even office hours . . . necessarily require conformity on the part of the public." [69] A useful articulation of the exemption's critical feature is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency.[70] In this light, the exemption has applied to a freeze placed on the processing of applications for radio broadcast stations,[71] to procedures accelerating the processing of applications for abandoning railroad lines [72] and those for processing discrimination charges,[73] and to a directive specifying that

**65.** 507 F.2d at 1113.

**66.** *Id.*

**67.** 5 U.S.C. § 553(b)(3)(A) (1976).

**68.** *See* Senate Judiciary Committee Print 18 (June 1945), *reprinted in* Administrative Procedure Act—Legislative History, 79th Cong., 2d Sess., S. Doc. No. 248 79th Cong., 2d Sess. (1946). The drafters specifically wanted publication of such practices to permit full public awareness of them. *See, e. g.,* S. Doc. No. 8, 77th Cong., 1st Sess. 26 (1941); Reich, *supra,* n.51, at 495–96 ("after two years of study . . ., the Attorney General's Committee on Administrative Procedure came to the conclusion that sufficient information was not given to the public about the organization, procedures, and rules of practice of the agencies").

**69.** E. Freund, Administrative Powers Over Persons and Property 213 (1928).

**70.** Thus the court concluded that the exemption relating to agency practice or procedure "should not be deemed to include any action which goes beyond formality and substantially affects the rights of those over whom the agency exercises authority. Certainly, it does not include formalized criteria adopted by an agency to determine whether claims for relief are meritorious." *Pickus v. United States Board of Parole,* 507 F.2d 1107, 1113 (D.C.Cir.1974). Similarly, in *Kessler v. FCC,* 326 F.2d 673, 680 (D.C.Cir.1963), this court quoted with approval the FCC's view that "[s]ubstantive rules are those which change standards of station assignments and procedural rules are those dealing with the method of operation utilized by the Commission in the dispatch of its business." *See also Aiken v. Obledo,* 442 F.Supp. 628, 649 (E.D.Cal.1977) ("Procedural rules are those that relate to the method of operation of the agency, while substantive rules are those which establish standards of conduct or entitlement.").

**71.** *Kessler v. FCC,* 326 F.2d 673, 679–83 (D.C. Cir. 1963).

**72.** *Commonwealth of Pennsylvania v. United States,* 361 F.Supp. 208, 220–21 (M.D.Pa.1973), *aff'd,* 414 U.S. 1017, 94 S.Ct. 440, 38 L.Ed.2d 310 (1973).

**73.** *Hall v. EEOC,* 456 F.Supp. 695, 702 (N.D. Cal.1978). There, Judge Peckam concluded that application of § 553 procedures would "hamstring agencies in their efforts to improve their internal procedures regarding the way they conduct their business, and rob them of virtually all flexibility in dealing with increasing workloads. Neither the APA nor notions of

requisite audits be performed by nonagency accountants.[74]

The exemption cannot apply, however, where the agency action trenches on substantial private rights and interests.[75] As the case law demonstrates, substantial rights and interests in this light have come into play when railroads are directed to file proposed schedules of rates and tariffs with subscribers;[76] when applicants for food stamps are subject to modified approval procedures;[77] when drug producers are subject to new specifications for the kinds of clinical investigations deemed necessary to establish the effectiveness of drug products prior to FDA approval;[78] and when motor carriers are subject to a new method for paying shippers.[79]

 Here, recipients of CETA emergency job program monies are subject to a new method for determining the one undefined variable in the statutory fund allocation formula. Although the methodology itself may look procedural, as Judge McGowan

noted in a similar context, "[t]he characterizations 'substantive' and 'procedural' no more here than elsewhere in the law—do not guide inexorably to the right result, nor do they really advance the inquiry very far."[80] The critical question is whether the agency action jeopardizes the rights and interest of parties,[81] for if it does, it must be subject to public comment prior to taking effect. As that is the case here, the exemption cannot apply.

## F. Impact of Vermont Yankee

DOL concludes its brief with the claim that "[e]specially in light of the Supreme Court's recent admonition in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.* [435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)], Maryland's attempt to engraft additional procedures beyond what Congress intended, must therefore fail."[82] Because similar claims recently have been made before this court,[83]

elementary fairness . . . require such a result." *Id.*

**74.** *Guardian Federal Savings and Loan Ass'n v. Federal Savings and Loan Insurance Corp.*, 589 F.2d 658, 665 (D.C.Cir.1978). In that case, we also found that the exemption applied to a regulation delegating authority from the Federal Savings and Loan Insurance Corporation to the Board's Chief Examiners for regional districts. *Id.* at 666. Both procedural regulations in that case allocate responsibility for performing required regulatory tasks; they do not determine the standards by which those tasks will be conducted nor the criteria affecting private parties' interests. The one regulation challenged in that case that articulated criteria for acceptable audits was exempted as a "general statement of policy" because it reserved discretion to the agency to accept or reject non-complying audits. *Id.* at 666. *See* p. 699 *supra.*

**75.** *See* E. Freund, *supra* note 69 at 213.

**76.** *Akron, Canton & Youngstown R.R. Co. v. United States*, 370 F.Supp. 1231, 1238 (D.Md. 1974).

**77.** *Aiken v. Obledo*, 442 F.Supp. 628, 649 (E.D. Cal.1977).

**78.** *Pharmaceutical Mfrs. Ass'n v. Finch*, 307 F.Supp. 858, 863 (D.Del.1970).

**79.** *Nat'l Motor Freight Traffic Ass'n v. United States*, 268 F.Supp. 90, 96 (D.D.C.1967), (three—judge court), *aff'd*, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968).

**80.** *Id. See Chamber of Commerce v. OSHA*, 636 F.2d 464, at 468 (D.C. Cir. 1980) ("The Administrative agency's own label is indicative but not dispositive; we do not classify a rule as interpretive just because the agency says it is.").

**81.** *See Commonwealth of Pennsylvania v. United States*, 361 F.Supp. 208, 221 (M.D.Pa.), *aff'd*, 414 U.S. 1017, 94 S.Ct. 440, 38 L.Ed.2d 310 (1973) (unlike criteria in *Pharmaceutical Mfrs. Ass'n v. Finch*, supra, the instant regulations "do not jeopardize the substantive rights of any parties" but merely accelerate the proceedings).

**82.** Appellee's Br. at 29.

**83.** In his separate opinion concurring in the result only in *Association of Nat'l Advertisers, Inc. v. FTC*, 617 F.2d 611 (D.C.Cir.1979), Chief Judge Skelly Wright noted that the Federal Trade Commission "in its brief questions whether the 'substantial impact' test can survive the *Vermont Yankee* decision." At 629 n.20. The "substantial impact" test, long used in this and other circuits, determines the applicability of § 553 procedures essentially by asking whether the agency action carries substan-

we briefly address the bearing of *Vermont Yankee* on this case.

DOL apparently relies on the Supreme Court's reiteration in *Vermont Yankee* of "statutory and decisional law cautioning reviewing courts against engrafting their own notions of proper procedures upon agencies entrusted with substantive functions by Congress."[84] Based on this concern,[85] the Supreme Court reversed this court's invalidation of the Nuclear Regulatory Commission's rule that specifies numerical values for the anticipated environmental effects associated with the uranium fuel cycle in light water cooled nuclear power reactors. The Court rejected what it deemed the "ineluctable mandate" of the court of appeals decision, that is, to require procedures beyond those prescribed in § 553 of the APA.[86] The essence of the Court's

decision, and the point that distinguishes *Vermont Yankee* from this case, was the conclusion that

nothing in the APA, NEPA,[87] the circumstances of this case, the nature of the issues being considered, past agency practice, or the statutory mandate under which the Commission operates permitted the court to review and overturn the rulemaking proceeding on the basis of the procedural devices employed (or not employed) by the Commission so long as the Commission employed *at least the statutory* minima, *a matter about which there is no doubt in this case.*[88]

In the instant case, however, the sole question is whether DOL employed the minimal procedural requirements established by statute for modifying the statistical methodology.[89] We conclude that the agency

tial impact on the rights and interests of private parties. *See, e. g., Pickus v. United States Board of Parole*, 507 F.2d 1107 (D.C.Cir.1974); *Lewis–Mota v. Sec'y of Labor*, 469 F.2d 478 (2d Cir. 1972); *Nader v. Butterfield*, 373 F.Supp. 1175 (D.D.C.1974); *Pharmaceutical Mfrs. Ass'n v. Finch*, 307 F.Supp. 858 (D.Del.1970); *Motor Freight Traffic Ass'n v. United States*, 268 F.Supp. 90 (D.D.C.1976) (three–judge court), *aff'd per curiam*, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968). Courts and scholars have adverted to fundamental fairness and to the advantages from informing the agency as justifications for the "substantial impact" test for notice and comment procedure. *See, e. g., Comment–A Functional Approach to the Applicability of Section 553 of the Administrative Procedure Act to Agency Statements of Policy*, 43 U.Chi.L.Rev. 430, 443–446 (1976). It is worth noting the central distinction between the "substantial impact" test and the kind of analysis employed in the text of this opinion. The "substantial impact" analysis does not conclude the determination of the legal force of the agency action in future proceedings *while assigning the classification of "legislative rule"* does. *Joseph v. United States Civil Service Comm'n*, 554 F.2d 1140, 1154 n.26 (D.C.Cir. 1977).

DOL suggests in the instant case that the "substantial impact" test may put a court in the posture of appearing to require procedures beyond those mandated by statute or voluntarily adopted by the agency, and in that fashion deviate from the implications of *Vermont Yankee. See* Appellee's Br. at 28–29. As the text demonstrates, we do not rely on the "substantial impact" analysis. Nonetheless, we find no reason to doubt the continued viability of the "substantial impact" test, as it simply articu-

lates one of several criteria for evaluating claims of exemption from § 553. *See Association of Nat'l Advertisers, Inc. v. FTC, supra*, at 629 n.20 (Wright, C. J., concurring in result only).

**84.** 435 U.S. at 535, 98 S.Ct. at 1207.

**85.** The Supreme Court acknowledged that the court of appeals rested its decision in part on its estimate of the insufficiency of the record and remanded for review of that record, with such supplementation as the Commission might provide. 435 U.S. at 541–42, 548, 98 S.Ct. at 1210, 1214.

**86.** 435 U.S. at 542, 98 S.Ct. at 1210. The Court also expressly rejected NRDC's argument that § 553 "merely establishes lower procedural bounds and that a court may routinely require more than the minimum when an agency's proposed rule addresses complex or technical issues or 'Issues of Great Public Import.'" *Id.* at 545, 98 S.Ct. at 1212.

**87.** National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq* (1976).

**88.** 435 U.S. at 548, 98 S.Ct. at 1214 (emphasis added). Thus the Court left open the possibility that "the nature of the issues being considered, past agency practice," or some combination of these factors with statutory mandate may warrant judicial imposition of additional procedural requirements.

**89.** Maryland also seeks relief under FOIA which requires publication in the Federal Reg-

erroneously omitted the minimal requirements prescribed by § 553 of the APA.[90]

DOL argues that this result will produce a parade of horribles and will require the use of § 553 procedures for "virtually any routine correction or refinement of technique." [91] This claim lacks merit. First, as this opinion makes clear, § 553 procedures apply only to rules not exempt by statute. Second, as DOL's own statement before the district court demonstrates,[92] the modification of the statistical methodology here was hardly a "routine correction or refinement." It was instead the agency's considered response to over a decade of serious criticism of its prior methodology.[93] Even the "Balance of State" corrective factor [94] applied to Maryland with the new methodology was selected "[u]pon examination" by the agency.[95] The methodology bears all the earmarks of conclusive agency action, governing the rights and interests of the public.[96] Future changes to the methodology that are truly "routine corrections or refinements" may easily be exempted from § 553 procedures as "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." [97] But where, as here, the agency action satisfies the APA's definition of a rule and eludes exemptions to § 553, it is procedurally defective unless promulgated with the procedures required by law.[98]

ister of such items as "statements of the general course and method by which [agency] functions are channeled and determined," "rules of procedure," and modification of the foregoing. *See* 5 U.S.C. § 552(a) (1976). We do not closely analyze this argument because the publication sought under FOIA is also required under the § 553 procedures of the APA that we today find applicable to the statistical methodology. *See* 5 U.S.C. § 553(d) (1976). Nonetheless, it is worth noting that publication under FOIA, if anything, should be easier to secure than under the APA, given the language and purposes of the two statutes.

Maryland also argues that notice and comment procedures would be required by CETA itself, without reference to the APA. Appellant's Br. at 19–23. Although we are not persuaded by this view, the language of 29 U.S.C. § 982 suggests that Congress intended § 553 of the APA to govern DOL's implementation of CETA. *See supra* n.60. Similarly, a congressional statement since the onset of this litigation bolsters, without independently requiring, our conclusion that § 553 procedures apply to the statistical methodology. After rejecting a proposed CETA amendment that would have required a *six–month* delay between the announcement and effectiveness of a new methodology for gathering unemployment statistics, *see* 124 Cong.Rec. S14424 (daily ed., Aug. 25, 1978) (remarks of Sen. Nelson), Congress included in its conference report the following language:

The Conferees intend that, in the event the Bureau of Labor Statistics proposes to make any substantial change in the method of calculating unemployment statistics that is likely to affect the amount of money allocated to any area on the basis of such statistics, due notice will be provided and the proposed change will be published in a timely fashion in order to allow an opportunity for comment prior to becoming effective.

H.R.Rep.No.95–1765, 95th Cong., 2d Sess., 134 (1978), U.S.Code Cong. & Admin.News 1978, pp. 4480 4599.

**90.** DOL suggests that interested parties had actual notice of the change in statistical methodology, although no notice ever appeared in the Federal Register. Appellee's Br. at 8 n.8. *See also* Memorandum Op., App. 30–31, 35. As the amicus brief of the City of Baltimore indicates, however, interested parties, including prime sponsors under CETA, were not notified or consulted unless they were officials of the state employment security agencies that gather some of the raw data, or members of the Interstate Conference of Employment Security Agencies, or certain other organizations that DOL happened to contact. Amicus Br. at 8–9. On this basis, we would have to reverse even if the only issue before this court were the sufficiency of past notice provided by DOL.

**91.** Appellee Br. at 28.

**92.** *See* Statement of Reasons, *supra* n.8.

**93.** *Id.* at 3a–4a (development of new methodology followed criticism and study by President's Commission to Appraise Employment and Unemployment Statistics).

**94.** *See* pp. 698–699 *supra.*

**95.** Statement of Reasons at 7a.

**96.** *See* sections III.B.–E. *supra.*

**97.** 5 U.S.C. § 553(b)(3)(A) (1976).

**98.** The publication requirement of § 553 calls for publication or service not less than 30 days before the rule's effective date. 5 U.S.C. § 553(d) (1976). The district court reasoned that this requisite pause between publication

## IV. DISPOSITION

■ Normally, a judicial determination of procedural defect requires invalidation of the challenged rule.[99] The posture of this appeal, however, calls for different treatment. We found justiciable only Maryland's claim that future modifications of the statistical methodology must be subject to notice and publication.[100] Therefore, our disposition will govern only such future modifications. We hold that any substantial change in the method of calculating unemployment statistics must be promulgated with advance publication by notice, opportunity for public comment, and final publication at least 30 days prior to effective date.[101]

■ In its amended complaint, Maryland also claimed that DOL's adoption of the new methodology is arbitrary and capricious.[102] Maryland requested that the district court defer ruling on this claim until after rulemaking procedures produce a record susceptible to judicial review. Applying this approach prospectively only, we agree. If Maryland or other interested parties wish to challenge future modifications of the methodology for gathering unemployment statistics, they may do so after DOL has promulgated such modifications according to requisite procedures.

## CONCLUSION

For the foregoing reasons, we reverse the district court's grant of summary judgment

and implementation would interrupt the process of developing unemployment statistics. Memorandum Op., App. at 33–34. Of course, the only interruption would be that which is required for all rules–an interruption between the time a new rule is conceived by an agency and the time it becomes effective. The development of unemployment statistics will be uninterrupted, but will have to follow the earlier methodology until the new one becomes effective. The application of a new methodology in fact may not cause delay. Here, within one day of notification that the Balance of State procedure had to apply to Maryland for fiscal 1976, the Regional Office applied that procedure and forwarded the recomputed statistics to the National Office. *See* Telegram to Frederick Bauer, DOL Philadelphia, from Martin Ziegler, DOL Washington, D.C. (Jan. 7, 1975) (confirming conversation of Jan. 7, 1975 that "Balance of State" procedure must be applied to Maryland); Letter to DOL, Washington, D.C. from Frederick Bauer and Rosa Bacon, DOL Philadelphia (Jan. 8, 1975) (enclosing revisions based on application of "Balance of State" procedure).

**99.** *E. g., Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, (D.C.Cir. 1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

**100.** *See* p. 699 *supra.* We also found the issue justiciable because it is capable of repetition, yet evading review.

**101.** In considering this issue, Congress recently indicated that advance notice and opportunity for comment is necessary "in the event the Bureau of Labor Statistics proposes to make any substantial change in the method of calculating unemployment statistics that is likely to affect the amount of money allocated to any

area on the basis of such statistics." H.R.Rep. No.95–1765, 95th Cong., 2d Sess. 134 (1978). U.S.Code Cong. & Admin.News 1978, p. 4599. *See* n.89 *supra.*

In a supplemental memorandum filed with this court, DOL announced its draft of a tentative plan to implement this intention of Congress. Appellees' Supplemental Memorandum, No. 78–1414 (filed March 29, 1979). That tentative plan, which apparently has never been formally adopted by DOL, would provide for advance publication in the Federal Register at least 60 days prior to implementation of significant changes in the statistical methodology, and meetings with interested parties. The directive of this court requires implementation of these steps as well as all other § 553 procedures, including a statement of basis and purpose to be published with proposed modifications. Such procedures must accompany DOL's next substantial change of the methodology, which DOL told this court is anticipated to occur in January, 1981. Letter to George Fisher, Clerk, U.S. Court of Appeals for the District of Columbia Circuit, from Al Daniel, Department of Justice (Dec. 21, 1979).

**102.** In support of its motion for summary judgment, Maryland argued that the substance of the methodology could not be reviewed without the creation of a rulemaking record, Plaintiff's Memorandum of Points and Authorities, No. 75–0253, at 24–26. On appeal, Maryland reiterates its claim that "a ruling as to the arbitrariness of the method . . . would be premature until after the method has been formally promulgated," and requests the court to retain jurisdiction until "compliance with the rulemaking procedures could produce a record which would form the basis for judicial consideration of that claim." Appellant's Br. at 4.

for DOL and order summary judgment for Maryland, consistent with this opinion.

*So ordered.*