**HEALTHCARE SAN ANTONIO, INC., Plaintiff,**

v.

**Enrique MENDEZ, Jr., M.D., Defendant.**

**Civ. A. No. 90–0845.**

United States District Court, District of Columbia.

Oct. 31, 1990.

John T. Brennan, Jr., Bonner & O'Connell, Washington, D.C., Patrick Hooper, Hooper, Lundy, Bookman, Inc., Los Angeles, Cal., for plaintiff.

Edith S. Marshall, Asst. U.S. Atty., Washington, D.C., for defendant.

---

## MEMORANDUM AND ORDER

REVERCOMB, District Judge.

## I. BACKGROUND

This case is before the Court on cross motions for summary judgment. The plaintiff, a health care provider doing business as Laurel Ridge Hospital, provides inpatient psychiatric services under the Civilian Health and Military Program of the Uniformed Services ("CHAMPUS"). In its complaint, the plaintiff claims that it has been paid lower rates than those required by the Defense Department's regulations for the services it provides to CHAMPUS beneficiaries. The defendant, the Acting Assistant Secretary of Defense for Health Affairs, asserts that the rate applicable to the plaintiff was calculated in accordance with the plain language of the regulations and, therefore, is not subject to challenge.

## II. REGULATORY SCHEME

In 1989, CHAMPUS implemented a new provider payment program. Prior to that date, providers had been reimbursed for charges actually billed for services rendered. This retrospective charge-based system was replaced by a prospective rate-based system. Under the new program, providers of hospital inpatient psychiatric services are divided into two categories, lower volume providers and higher volume providers. Higher volume hospitals are those for which there exists sufficient historical data regarding service charges to CHAMPUS upon which to calculate a valid, hospital-specific per diem, per patient rate. Hospital-specific per diem rates, on the other hand, cannot be determined for lower volume providers, because such hospitals have insufficient history of charges to CHAMPUS upon which such a calculation could be made. Accordingly, lower volume providers are paid on the basis of regional per diem rates based on all CHAMPUS claims for the applicable region.

The CHAMPUS regulations provide a detailed scheme for establishing the per diem rates for high volume hospitals. 32 C.F.R. § 199.14 The scheme involves two administrative determinations: (1) the determination of whether a hospital qualifies as a higher volume provider, and (2) a determination of the specific per diem rate applicable to that hospital.

### a. Determination of Higher Volume Hospital Status

When the new payment program was first implemented, all participating hospitals were classified as either lower or higher volume providers. The regulation defines a higher volume hospital as "[a]ny hospital or unit that had an annual rate of 25 or more CHAMPUS discharges of CHAMPUS patients during the period July 1, 1987 through May 31, 1988." *Id.* § 199.14(a)(2)(v)(A). Hospitals satisfying this criterion shall be considered to be higher volume providers during the 1989 federal fiscal year and all subsequent years. *Id.*

The regulation also includes a section concerning hospitals that subsequently become higher volume providers and an additional section that authorizes a retrospective adjustment of program payments for new hospitals which are designated as higher volume providers after the initial implementation of the rate-based payment program. *Id.* § 199.14(a)(2)(v)(B), (C). The retrospective adjustment provision was intended to "assure proper recognition of what may be high capital costs and other special circumstances of new hospitals." 53 Fed.Reg. 34288 (1988). Finally, the regulation provides a mechanism by which hospitals may seek review of what it believes is the erroneous failure of the Office of CHAMPUS to designate it as a higher volume provider. 32 C.F.R. § 199.14(a)(2)(v)(D).[1]

---

**1.** Here, plaintiff challenges its designation as a higher volume provider in a year *before* that in which plaintiff claims that it was first eligible for that status. Apparently, because once a per diem rate is established there are no adjustments other than inflationary updates, it is in the plaintiff's interest, as a new hospital with expanding treatment capacity, to avoid higher volume classification for as long as its charges are increasing. The regulations, however, address the special circumstances of new hospitals. Moreover, for the reasons discussed at the end of this opinion, it is exactly this type of

### b. Determination of Hospital Specific Per Diem Rates

32 C.F.R. § 199.14(a)(2)(ii) provides, in part:

(A) *Per Diem Amount.* A hospital specific per diem amount shall be calculated for each hospital and unit with a high volume of CHAMPUS discharges. The base period per diem amount shall be equal to the hospital's average daily charge in the base period. The base period amount, however, may not exceed the cap described in paragraph (a)(2)(ii)(B) of this section.[2]

This provision is further clarified by a later section defining base period calculations, which explains: "Base period calculations shall be based on actual claims paid during the period July 1987 through May 31, 1988, trended forward to represent the 12–month period ending September 30, 1988 on the basis of the Medicare inpatient hospital market basket rate." *Id.* § 199.14(a)(2)(iv)(A). The base period per diem amount determined pursuant to these provisions shall apply in the fiscal year 1989 and all subsequent fiscal years. In the case of new hospitals, per diem rates are calculated in the same manner as hospitals originally designated as higher volume providers,[3] except that the base period for purposes of the calculation is the year in which the hospital first had 25 or more CHAMPUS discharges. *Id.* § 199.14(a)(2)(v)(B).

According to these provisions, a hospital which has been designated as a higher volume provider—*ie.,* that has 25 or more CHAMPUS discharges in a fiscal year—will be subject to a per diem payment rate equal to the average daily charge per CHAMPUS patient. That rate is determined with reference to actual claims paid

during the base period. The regulations, however, provide an alternative hospital-specific data base for the determination of the per diem rate which may be applied in cases where the particular hospital "has generally experienced unusual delays in claims payments and if the use of such an alternative data base would result in a difference in the per diem amount of at least $5.00." 32 C.F.R. § 199.14(a)(2)(iv)(B). The hospital seeking to invoke this provision must apply to the Director. If the application is approved, the alternative data base for purpose of the per diem rate calculation will consist of claims with a date of discharge during the base period *rather than* claims with a date of payment during the same period. *Id.*

Once a hospital-specific per diem rate is determined, no increases will be made to that rate *except* for an annual adjustment based on the Medicare update factor. *Id.* § 199.14(a)(2)(iv)(C). In describing this limitation on adjustments to the per diem rates, the administration explained that "[i]nstead of paying any increase hospitals may charge, CHAMPUS will pay reasonable increases tied to inflation.... CHAMPUS can no longer afford to continue paying psychiatric hospitals and units whatever they charge." 53 Fed.Reg. 34285–86 (1988).

The regulation provides the following provision for the review of per diem rate calculations:

Any hospital or unit which believes [the Office of CHAMPUS] calculated a hospital-specific per diem which differs by more than five dollars from that calculated by the hospital or unit may apply to the Director of [the Office of CHAMPUS] or designee for a recalculation.

increase in charges by care providers which the regulations were drafted to avoid.

**2.** Section (a)(2)(ii)(B) provides that the base period per diem amount may not exceed the eightieth percentile of the average daily charge weighted for all discharged throughout the United States from all higher volume hospitals. The per diem rate calculations at issue in this suit never exceeded this cap.

**3.** The regulation concerning per diem rates for new hospitals and other hospitals which subsequently become higher volume providers specifically directs per diem rate for these hospitals to be calculated in accordance with § 199.14(a)(2)(ii), which provides, in part, that calculations be based on "actual claims paid."

The burden of proof shall be on the hospital.

32 C.F.R. § 199.14(a)(2)(ii)(C).

## III. APPLICATION OF THE REGULATIONS IN THIS CASE

Laurel Ridge Hospital opened in 1987.[4] When the new CHAMPUS payment program was initiated, Laurel Ridge was originally designated as a lower volume provider. The defendant, however, later discovered that this designation was erroneous, as it was based on a database which did not contain all the relevant data concerning CHAMPUS discharges during the base period. Def. Response Under Local Rule 108(h) at 1.[5] The correct information revealed that the plaintiff had 36 CHAMPUS discharges during the base period of July 1, 1987 through May 31, 1988. Pl. Response to Def.'s Statement of Material Facts, ¶ 20. Accordingly, the defendant calculated Laurel Ridge's per diem rate based upon the data concerning the actual claims paid during the base period. That calculation, trended forward to 1989, resulted in a per diem rate of $464.00. *Id.*

## IV. ANALYSIS

The plaintiff has challenged the manner in which it was designated a higher volume provider and the calculation of its per diem rate.

### a. *Determination of Higher Volume Hospital Status*

The plaintiff asserts that the CHAMPUS regulations require higher volume hospital status to be determined on the basis of the number of *paid claims* for discharges during the base period. The plaintiff's argument, however, contradicts the unambiguous language of the regulation. The regulation expressly defines higher volume hospitals as those with "25 or more CHAM-

PUS *discharges.*" 32 C.F.R. § 199.14(a)(2)(v)(A). The same language appears in the provision concerning hospitals which subsequently become higher volume hospitals. *Id.* § 199.14(a)(2)(v)(B).

The plaintiff in arguing that the discharges relevant for a determination of higher volume provider status only include *paid* discharges appears to rely on the fact that the regulations require per diem rates to be calculated using information concerning claims actually paid. However, the determination of whether or not a hospital is a higher volume provider is completely independent of a determination of what the per diem rate should be for a specific higher volume hospital. Accordingly, it is not inappropriate for the regulations to resort to different statistical bases for the different administrative determinations.

### b. *Per Diem Rate Calculation*

The plaintiff argues that, regardless of how higher volume hospital status is determined, the per diem rate must be based on all CHAMPUS claims for discharges occurring during the base year. Once again, the plaintiff's argument contradicts the plain language of the regulation. The relevant language directs that per diem rate calculations be based on the number of "actual claims paid" during the base period. Plaintiff's interpretation of this language would ignore the word "paid" and would read into the provision a requirement that the claim relate to a discharge.

The plaintiff's interpretation is wrong in both respects. First, it is abundantly clear that the regulations intend rate calculations to be based on claims paid. This is not only reflected in the plain language of the provision but is also evidenced by the fact that the regulation provides an alternative calculation method for hospitals

---

4. Although Laurel Ridge was a "new hospital", it had sufficient discharges in the base period to qualify as a higher volume provider when the rate-based payment program was implemented. Accordingly, this case does not involve the application of the special rules applicable to new hospitals.

5. Although the plaintiff characterizes the defendant's initial failure to properly classify Laurel Ridge and its subsequent correction of that mistake as evidence of the defendant's contradictory interpretation of his own statutory scheme, the defendant has explained that the reversal of the earlier administrative determination resulted from an initial error in the database concerning CHAMPUS discharges.

which generally experience unusual delay in claims payments. *Id.* § 199.14(a)(2)(iv)(B). In such a case, if requested by the hospital, the hospital can have its base period calculations based on claims with a date of discharge rather than claims paid during the base period. Before this alternative method can be used, however, the hospital must show that its use would result in a difference in per diem rate of at least $5.00.

The plaintiff has stated that if the defendant had based Laurel Ridge's per diem rate on information concerning all discharges during the 1988 fiscal year, the rate would have been $500.00. Pl. Response to Def.'s Statement of Material Facts, ¶ 20. Since $500.00 is more than $5.00 greater than $464.00 (the per diem rate calculated by the defendant), if the plaintiff could show that it generally experiences unusual delay in the payment of claims, the plaintiff could have requested that the alternative method be used for the calculation of its per diem rate.

The second suggestion of the plaintiff's interpretation of the rate calculation provision—that the calculation be based on claims relating to discharges—also has no basis in the regulatory language. Here again, the plaintiff seems to be reading into one determination aspects relevant to another determination; however, just because higher volume hospital status is determined with reference to discharges does not mean that only claims relating to discharges are relevant to per diem rate calculations. In fact, that requirement makes no sense. During the base period, the plaintiff had 28 paid claims. Although only a portion of these represented paid discharges,[6] these claims provide the defendant with sufficient information upon which a valid per diem, per patient rate can be determined.

Because the Court finds that the statutory language is unambiguous, it need not address the plaintiff's argument that the defendant's "interpretation" of the regulatory language is inconsistent with the ex-

press intent and purpose of the regulation and leads to an unfair result. However, the Court will state that the CHAMPUS regulations indicate a Congressional policy of limiting the ever-increasing prices which psychiatric hospitals charge to the government. The commentary published with the regulations in the Federal Register, which was quoted earlier in this opinion, expresses this goal in explaining why the regulations limit increases in per diem rates to simple inflationary updates. To accept the plaintiff's arguments in this case would undermine this Congressional policy by allowing higher volume hospitals to avoid being locked into a per diem rate during a year in which their average charge amounts are increasing.

For the foregoing reasons, the plaintiff's Motion for Summary Judgment is DENIED, and defendant's Motion for Summary Judgment is GRANTED.

---

**6.** The actual number of paid discharges is in dispute. The plaintiff claims the number to be only 13; defendant asserts that the number is 19. Def. Response Under Local Rule 108(h) at

**3.** Since this statistic is not relevant to a determination of Laurel Ridge's per diem rate, this factual dispute does not preclude summary judgment in this case.