**ALVARADO PARKWAY INSTITUTE, INC., et al., Plaintiffs,**

v.

**Enrique MENDEZ, Jr., M.D., Assistant Secretary of Defense for Health Affairs, Defendant.**

Civ. A. No. 90–0490 (GHR).

United States District Court, District of Columbia.

April 9, 1992.

---

**22.** For example, people who are attending out-of-state schools or serving in the military.

John T. Brennan, Thomas A. Guidoboni, Bonner & O'Connell, Washington, D.C., Pa-

tric Hooper, Hooper, Lundy & Bookman, Inc., Los Angeles, Cal., for plaintiffs.

Edith S. Marshall, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM AND OPINION

REVERCOMB, District Judge.

This dispute, which is before the Court on dispositive cross-motions, arises out of the prospectively-determined per diem rate system by which the Civilian Health and Military Program of the Uniformed Services ("CHAMPUS"), 10 U.S.C. §§ 1071–1104, reimburses hospitals providing inpatient mental health services to CHAMPUS beneficiaries. In essence, the dispute presents two questions: First, when a federal agency discovers it has made a mistake in calculating rates according to a method adopted in a properly promulgated rule, does the retroactive application of its later corrective recalculations to regulated parties constitute impermissible retroactive rulemaking? Second, even if there were no retroactive rulemaking, were the corrective measures of the agency nevertheless unreasonable, or unreasonably executed? On the facts presented here, and for the following reasons, the Court's answer to both questions is "no."

Plaintiffs are state-licensed hospitals providing inpatient psychiatric services, and are certified by CHAMPUS to provide such services to CHAMPUS patients. Defendant is the Assistant Secretary of Defense for Health Affairs, who is the government official responsible for administering the CHAMPUS program. The responsibility for day-to-day administration of the CHAMPUS program is delegated from defendant to the Director of the Office of CHAMPUS ("OCHAMPUS").

Plaintiffs argue that OCHAMPUS's decision, announced in the *Federal Register* on November 28, 1989, to apply a corrected reimbursement rate for inpatient psychiatric services back to October 1, 1989, constituted retroactive rulemaking in violation of CHAMPUS regulations,[1] sections 551(4) and 553 of the Administrative Procedure

---

1. Codified at 32 C.F.R. §§ 199.1–199.16 (1991).

Act ("APA"),[2] and common law doctrines disfavoring retroactive rulemaking absent specific Congressional authorization. For his part, defendant denies that the announcement and implementation of a revised reimbursement rate constituted retroactive rulemaking because it did not alter the methodology previously adopted in final regulations. And, although defendant concedes that OCHAMPUS did in one instance violate its own regulations in revising the reimbursement rates, it argues that the violation did plaintiffs no harm, and that as a consequence plaintiffs lack standing to challenge its agency action.

## BACKGROUND

The facts of this case are largely undisputed. The CHAMPUS program provides medical and dental care for dependents of members of the uniformed services and for certain retired military personnel and their dependents. 10 U.S.C. § 1071. These health care benefits include the treatment of mental illness. 10 U.S.C. § 1077(a)(5). Inpatient mental health services are provided at hospitals like plaintiffs, which are certified by CHAMPUS as eligible to provide such care to CHAMPUS beneficiaries. CHAMPUS pays a portion of the cost of such services to CHAMPUS patients; the patients share in the cost.

Prior to January 1, 1989, CHAMPUS reimbursed providers of inpatient psychiatric services on the basis of usual and customary charges billed by the hospitals. In 1988, the Department of Defense ("DOD") decided to adopt a more cost-effective method of payment for these services "based on prospectively set fixed rates for each day of hospital services provided." 53 Fed.Reg. 20,585 (June 3, 1988). Accordingly, the DOD commissioned a study by the RAND Corporation to examine the feasibility of a per diem payment system, and published for comment a proposed rule

based on the RAND analysis. *See* 53 *Fed. Reg.* 34,285 (Sept. 6, 1988). On September 6, 1988, OCHAMPUS responded to public comments and promulgated its final regulations establishing a prospectively determined per diem rate method of payment for inpatient mental health care. *See* 53 *Fed. Reg.* 34,285 (codified at 32 C.F.R. § 199.-14(a)(2) (1991)).

Under this new reimbursement system, certain hospitals—known as "high volume" hospitals—which have historically provided a sufficient volume of services to CHAMPUS patients to permit a valid rate calculation, were to receive hospital-specific per diem rates. These per diem rates were calculated on the basis of each hospital's actual average daily charges during a period from July 1, 1987 to May 31, 1988, trended forward through an inflationary adjustment to September 30, 1988. *See* 32 C.F.R. § 199.14(a)(2)(v)(A).[3] This period then became the base period in determining per diem rates, except that rates were subject to a "cap" set at the 80th percentile of the average daily charges of all high-volume hospitals.[4] Thus, no high-volume hospital, regardless of its actual per diem charges, could receive a rate beyond the rate cap. The capped rate for high-volume hospitals was calculated to be $629 per day, and this figure was published in the *Federal Register* in a section titled "General Description of the CHAMPUS Per Diem Payment System for Psychiatric Hospitals and Units." 53 *Fed.Reg.* 34,286. Thus conceived, this prospective per diem reimbursement system was to go into effect on January 1, 1989. In most instances, high-volume providers were notified of their respective hospital-specific dates prior to January 1, 1989.

The regulations promulgated on September 6, 1988, also stated that subsequent increases in per diem rates would be limit-

---

2. 5 U.S.C. § 551 *et seq.*

3. The determination of hospital-specific per diems is described in more detail in this Court's opinion in *Healthcare San Antonio v. Mendez*, 750 F.Supp. 10, 11–12 (D.D.C.1990).

4. The rate cap provision reads:

. . . .

(B) *Cap.* The base period per diem amount may not exceed the eightieth percentile of the average daily charge weighted for all discharges throughout the United States from all higher volume hospitals.
32 C.F.R. § 199.14(a)(2)(ii)(B).

ed to annual increases prescribed by Congress for Medicare providers, and that there would be no update of rates for fiscal year 1989. 32 C.F.R. § 199.14(a)(2)(iv)(C).[5] The regulations only discuss retrospective payments in a subsection addressing payments to new hospitals that qualify as high-volume hospitals. *See* 32 C.F.R. § 199.14(a)(2)(v)(C).

After the regulation and the originally calculated per diem rates had gone into effect, OCHAMPUS officials discovered that the provider rates as calculated were "substantially erroneous." This error appears to stem from deficiencies in the data base used to calculate the per diem rates.[6] As a consequence of these errors, OCHAMPUS officials discovered that in many cases high-volume hospitals were being reimbursed at "substantially inflated" rates. Accordingly, OCHAMPUS officials decided to recalculate the per diem rates, including the "hospital-specific rate cap," to correct error attributable to the faulty data base.[7] This recalculation did not apply to *all* rates, because some hospital-specific per diem rates had already been recalculated prior to October 1, 1989 by CHAMPUS Fiscal Intermediaries [8] pursuant to a regulatory administrative review procedure. OCHAMPUS officials decided to honor these recalculated "FI rates."

OCHAMPUS did not proceed by notice and comment rulemaking procedures in undertaking these recalculations. Rather, OCHAMPUS informally notified those providers whose rates had not been recalculated prior to October 1, 1989 (the beginning of the fiscal year) that rate recalculations were needed, and that the revised rates would be effective as of the beginning of fiscal year 1990. *See* Regensberg Aff., Attach. C & D. The actual recalculations, however, were not completed before October 1, 1989, notwithstanding the fact that the regulations require that providers receiving hospital-specific reimbursements will be notified of changes in their reimbursement rates *prior to* the beginning of each fiscal year. Instead, formal announcement of the revised rates and rate cap was made through a *Federal Register* notice of November 28, 1990. *See* 54 *Fed. Reg.* 48,926 (Nov. 28, 1989). This notice stated that revised per diem rates were effective as of October 1, 1989, and that the rate cap was lowered from $629 per day to $614 per day. *Id.* at 48,927.

In addition, the Department of Defense required providers to use the revised per diem rates to recalculate the cost-sharing obligation of CHAMPUS patients for services provided retroactively to January 1, 1989. Providers subject to this additional requirement were notified by letter in late January 1990, rather than by publication in the Federal Register or by promulgation in regulation form.

Alvarado Parkway Institute, a group of hospitals providing inpatient psychiatric care and part of the high-volume group of providers under CHAMPUS, sought and was denied administrative review of these changes in reimbursement rates. Alvarado subsequently brought suit against the DOD in this Court, and filed its second

---

5. This provision states in pertinent part as follows:

. . . .

    (C) *Update factors.* The hospital-specific per diems . . . calculated for the base period . . . shall be in effect for Federal fiscal year 1989; *there will be no additional update for fiscal year 1989.* For subsequent Federal fiscal years, each per diem shall be updated by the Medicare update factor for hospitals and units exempt from the Medicare prospective payment system. *Hospitals and units with hospital-specific rates will be notified of their respective rates prior to the beginning of each Federal fiscal year.*

32 C.F.R. § 199.14(a)(2)(iv)(C) (emphasis added).

6. This data base was derived from a data file known as the "UB-82 file."

7. OCHAMPUS contracted with the Lewin/ICF Company to undertake the recalculation of both the mental health per diem rates and the revised, hospital-specific "cap." The data which OCHAMPUS provided Lewin/ICF for this purpose consisted of an extract of a CHAMPUS data file known as the "QRDF file," from which data relating to care rendered at residential treatment centers had been excluded.

8. Fiscal Intermediaries ("FIs") are independent firms with whom DOD contracts to do statistical analysis for the CHAMPUS program.

amended complaint for declaratory, mandamus, and injunctive relief on August 2, 1991. The parties have now cross-moved for summary judgment.[9]

## ANALYSIS

It should be clear that plaintiffs do not challenge the lawfulness of the final rule promulgated on September 6, 1988 and published in the *Federal Register*. *See* 53 *Fed.Reg.* 34,285 (codified at 32 C.F.R. § 199.14(a)(2) (1991)). Plaintiffs claim instead that the *recalculation* of reimbursement rates was illegal in seven respects: 1) that the application of the revised per diem cap for the base period, announced on November 28, 1989, back to October 1, 1989, constituted impermissible retroactive rulemaking; 2) that OCHAMPUS violated its own regulations in recalculating the base period cap by including eight hospitals that were not in the QRDF data file but which had received hospital-specific per diems in 1989; 3) that the recalculated base period per diem rate violated CHAMPUS regulations because the average daily charge for high volume hospitals was calculated on the basis of claims processed to completion rather than claims paid; 4) that the recalculated cap was based upon an average daily charge for high volume hospitals weighted for days of care rather than for discharges, in violation of CHAMPUS regulations; 5) that OCHAMPUS failed to comply with its own regulations in failing to notify high volume hospitals of the revised rate before

the beginning of federal fiscal year 1990, on October 1, 1989; 6) that the recalculations were so erroneous as to have been made in bad faith; and 7) that the deflator used to calculate the base period per diem for hospitals which subsequently became high-volume hospitals was improperly calculated.[10]

The Court is satisfied, on its review of the record and the parties' briefs, that there are no disputed issues of material fact precluding entry of summary judgment in this case. *See* Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986). Review of defendant's actions is governed by section 10(e)(2)(A) of the APA, which permits this Court to set aside agency action only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This standard of review is a highly deferential one. It presumes agency action to be valid." *Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1, 34 (D.C.Cir.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). With this standard in mind, the Court will now consider each of plaintiffs' claims in turn.

### 1. *Retroactivity*

■ Plaintiffs argue that the recalculation of the 1989 hospital-specific per diem cap of $614, announced in the *Federal Register* on November 28, 1989, and its applica-

---

9. Defendant's instant motion is styled a Renewed Motion to Dismiss the Case, or in the Alternative for Summary Judgment, in which dismissal for failure to state a claim is one of the remedies sought. Because the Court has reviewed matters outside the pleadings submitted by defendant (and by plaintiffs, too), the Court will treat defendant's motion as one for summary judgment to be decided as provided in Fed.R.Civ.P. 56. *See* Fed.R.Civ.P. 12(b).

10. In their Second Amended Complaint, filed August 2, 1991, plaintiffs reiterated a claim in their original complaint of March 2, 1990, that a policy of CHAMPUS, announced in letters dated January 26, 1990, requiring plaintiffs to refund cost-sharing payments to CHAMPUS patients back to January 1, 1989 on the basis of the recalculated reimbursement rates, is invalid retroactive rulemaking. *See* Pls.' 2nd Am. Compl.

¶ 20. In his Renewed Motion to Dismiss the Case, or in the Alternative for Summary Judgment, which is now before the Court, defendant incorporates by reference his argument, contained in his first Motion to Dismiss the Case, or in the Alternative for Summary Judgment, that application of the refund policy back to January 1, 1989 was neither retroactive rulemaking nor unlawful. *See* Def.'s Mem. in Supp. of Renewed Mot. to Dism. (filed October 17, 1991) at 11 (incorporating Def.'s Mem. in Supp. of Mot. to Dism. (filed June 11, 1990) at 10–26). Because plaintiffs do not oppose this argument in their brief in opposition to defendant's instant motion, and because plaintiffs do not argue the alleged illegality of this policy in their own Motion for Summary Judgment, the Court will treat defendant's argument on this issue as conceded.

tion back to October 1, 1989, constituted retroactive rulemaking of the sort declared impermissible in *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). In *Bowen*, the Supreme Court invalidated the retroactive application, by the Secretary of Health and Human Services, of a cost reimbursement regulation in the absence of "express authorization" from Congress to do so. *Bowen*, 488 U.S. at 213–14, 109 S.Ct. at 474 (interpreting the Medicare Act, 42 U.S.C. § 1395x(v)(1)(A)(ii)). In a concurring opinion, Justice Scalia explained that section 551(4) of the APA similarly barred the retroactive application of a rule, because "a rule is a statement that has legal consequences only for the future." *Id.* at 217, 109 S.Ct. at 476 (Scalia, J., concurring).

Defendant disputes the characterization of this recalculation as substantive rulemaking. Rather, defendant argues, OCHAMPUS simply corrected deficiencies in the application of the final rule promulgated on September 6, 1988, which was itself unchanged by the subsequent recalculations.[11] At most, defendant maintains, the recalculation was an "interpretive rule," and thus exempt from the rulemaking procedures of the APA. *See* 5 U.S.C. § 553(b)(A).[12] "While the spectrum between a clearly interpretive rule and a clearly substantive one is a hazy continuum," the court of appeals for this circuit has provided district courts with guidance in determining where along that spectrum a particular agency action belongs. *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C.Cir.1987). Substantive rules "grant rights, impose obligations, or produce other significant effects on private interests. They also narrowly constrict the discretion of agency officials by largely determining the issue addressed." *Batterton v. Marshall*, 648 F.2d 694, 701–2 (D.C.Cir.1980). An interpretive rule, in contrast, "is an agency statement interpreting an existing statute or rule." *Id.* at 705. Such rules clarify or explain, or remind parties of existing obligations. *See American Hosp. Ass'n*, 834 F.2d at 1045–46; *Cabais v. Egger*, 690 F.2d 234, 238 (D.C.Cir. 1982). Because existing obligations remain unchanged, the retroactive effect of an interpretive rule has been upheld when reasonable. *See Chemical Waste Management, Inc. v. U.S. Environmental Protection Agency*, 869 F.2d 1526, 1534 (D.C.Cir. 1989). There is little doubt, however, that a *methodology* adopted for the purposes of calculating monies to be disbursed by an agency bears the hallmarks of a substantive rule under section 551(4) of the APA. *See Batterton*, 648 F.2d at 704.

Thus, *Bowen* would bar the retroactive application of recalculated per diem reimbursement rates (and the rate cap) only if

---

**11.** Defendant relies heavily on *Georgetown Univ. Hosp. v. Bowen* (*Bowen II*), for the proposition that retrospective adjustment of a reimbursement rate is not impermissible retroactive rulemaking so long as the affected party knows beforehand that reimbursement levels are fixed by generally applicable rules. *See* 862 F.2d 323, 327–28, 330 (D.C.Cir.1988). While our court of appeals did state that "the real linchpin of the system may not be that the exact reimbursement *figure* is known in advance, but rather may be that the hospital knows that nothing it does in providing services will lead to a higher reimbursement level," *id.* at 330, plaintiffs correctly note that this case turned on a construction of a statutory scheme involving a Congressionally mandated transition period. There is no such transition scheme in the governing CHAMPUS statute, nor does the statute prescribe the exact reimbursement system adopted by DOD for inpatient psychiatric care. *See* 10 U.S.C. § 1071 *et seq.* The statute does, however, reference the Medicare reimbursement scheme at issue in *Bowen II* in provisions requiring the Secretary of Defense to enter into health plan contracts for dependents of members of the uniformed services. *See* 10 U.S.C. § 1079(j)(2)(A) (providing that reimbursement of providers of health care services shall be determined to the extent practicable in accordance with 42 U.S.C. § 1395 *et seq.*). Section 1079 of Title 10 is one of the statutes cited by the Secretary of Defense as authority for the CHAMPUS regulations involved in this case. *See* 32 C.F.R. § 199.1 (1991).

**12.** Defendant has not stated, and the Court will not address, whether section 553's exemption from all procedural requirements for "a matter relating to agency management or personnel or to public property, loans, grants, *benefits*, or contracts" applies here, or whether the Secretary of Defense has waived this exemption. *See* 5 U.S.C. § 553(a)(2) (emphasis added); *Humana of South Carolina v. Califano*, 590 F.2d 1070, 1082–83 (D.C.Cir.1978).

the recalculated rates constituted a substantive rule. *See Bowen,* 488 U.S. at 206–7, 109 S.Ct. at 470–71 (describing the rule at issue in that case as involving a wage-index method for calculating cost limits for Medicare reimbursement payments to hospitals). The parties agree that this determination rests on whether, in revising the hospital-specific per diems and the cap, OCHAMPUS used a different methodology from that promulgated in the September 6, 1988 rule, *see* 53 *Fed.Reg.* 34,285, rather than merely correcting an application of that rule.

Defendant has the better argument here. The Court is satisfied that the recalculation announced on November 28, 1989, did not so alter the methodology promulgated in 1988 as to constitute a substantive rule, subject to the APA's notice-and-comment requirements and *Bowen*'s strictures against retroactive application. Rather, the September 6, 1988 rule—which set forth *how* the hospital-specific per diems and the cap were to be calculated, but which did not itself specify particular rates—was not supplanted and remains in effect. While there were instances in which OCHAMPUS did not follow the strict letter of its regulations, as defendant concedes, these do not amount to a change in the methods warranting application of *Bowen.* Moreover, it is undisputed that plaintiffs received notice of the need to recalculate hospital-specific per diems *before* October 1, 1989. *See* Regensberg Aff., Attach. C & D. While the announcement that the revised rates "will likely be published in the *Federal Register* in September 1989" proved to be wishful thinking, the notice unambiguously stated that the revised rates would be effective October 1, 1989. Regensberg Aff., Attach. C. The Court thus concludes that the revised per diem rates and rate cap announced on November 28, 1989, constituted an interpretive rule of an existing regulation. Although such rules are entitled to less deference than are substantive rules, *see Samaritan Health Serv. v. Bowen,* 811 F.2d 1524, 1529 (D.C.Cir.1987), in this instance the Court finds the retroactivity challenged here to have been reasonable.

### 2. *Alleged Alteration of the Base Period*

Plaintiffs point to the next three alleged violations of the CHAMPUS regulations in arguing that the recalculation did involve a change in method. They contend in effect that OCHAMPUS expanded the July 1, 1987 to May 31, 1988 base period, in violation of 32 C.F.R. § 199.14(a)(2)(iv)(A), by including in its recalculations claims actually paid to eight or nine hospitals during 1989. Having reviewed the material to which the parties direct the Court on the point, it is apparent that this alleged violation is illusory. The eight hospitals in question were high-volume hospitals which were erroneously omitted from the original calculations for the base period undertaken by the RAND Corporation. *See* Third McCanna Decl. ¶ 7. Far from violating the section 199.14(a)(2)(iv)(A), it would appear that defendant's corrective measures more faithfully adhered to it, in that the regulation requires base period per diems to be predicated on claims actually paid to high-volume hospitals during the prescribed period. *See Healthcare San Antonio,* 750 F.Supp. at 13–14.

### 3. *Claims Paid versus Claims Processed to Completion*

■ Plaintiffs next complain that the recalculated base period per diem rate violated the same provision of the CHAMPUS regulations because the average daily charge for high-volume hospitals was calculated on the basis of claims processed to completion rather than on the basis of "claims paid." *See* 32 C.F.R. § 199.-14(a)(2)(iv)(A). Defendant concedes that this was so: "the defendant's contractor utilized claims with dates within the base period on which the claims were 'processed to completion' by the involved Fiscal Intermediaries." Def.'s Mem. in Op. to Pls.' Mot. for Summ. J. at 9. Defendant argues, however, that the differences between "claims paid" and "claims processed to completion" are usually slight, and that the latter, therefore, is a reasonable proxy for the former. *See* Second Barnett Decl. ¶¶ 2–4; Barnett Dep. at 107–8. Moreover,

the QRDF data file used by Lewin/ICF in recalculating the rates did not allow for any other method of determining "claims paid." Second Atkins Aff. ¶ 2. The Court believes that defendant's use of "claims processed to completion" as a proxy for "claims paid" was reasonable, and consistent with the concept of an interpretive rule.

#### 4. *Weighting of Average Daily Charge*

■ Defendant also concedes that the recalculated cap was based upon an average daily charge for high-volume hospitals weighted for days of care rather than for discharges, in violation of 32 C.F.R. § 199.-14(a)(2)(ii)(B). Defendant challenges plaintiffs' standing with regard to this violation, arguing that plaintiffs have failed to make the requisite showing of a particularized injury as a result of the challenged action. Standing, of course, requires just such a showing, whether considered under the constitutional standard or section 702 of the APA. *See Alan v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324-25, 82 L.Ed.2d 556 (1984); *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1991); *Albuquerque Indian Rights v. Lujan,* 930 F.2d 49, 55 (D.C.Cir.1991). Review of agency action under section 702 requires the party seeking review to show that he is "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.[13] When standing is challenged on a motion for summary judgment, "[t]he burden is on the party seeking review under § 702 to set forth specific facts (even though they may be controverted by the Government) showing that he has satisfied its terms." *Lujan,* 110 S.Ct. at 3187. This burden must be discharged in accordance with Rule 56(e), which requires that "the adverse party's response, by affidavits or as otherwise provided by this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Plaintiffs have failed to carry this burden. They rely instead on the following assertion: *"If* the calculation of the base period rates was incorrect, plaintiffs *may* have been harmed by being underpayed [*sic* ], and will continue to be injured because all future payments are derived from the base period calculation." Pls.' Op. to Def.'s Mot. for Summ. J. at 8. Under the Supreme Court's standing jurisprudence and the law of this circuit, plaintiffs cannot rest a claim of injury from agency action on such a speculative assertion, especially when that claim is challenged in a motion for summary judgment. *See Lujan,* 110 S.Ct. at 3186-87; *United Presbyterian Church in the U.S.A. v. Reagan,* 738 F.2d 1375, 1383 (D.C.Cir.1984) (citing *Warth v. Seldin,* 422 U.S. 490, 501-02, 95 S.Ct. 2197, 2206-07, 45 L.Ed.2d 343 (1975)).

#### 5. *Recalculating versus Updating the Cap*

■ The CHAMPUS regulations provide that, once the hospital-specific base period per diems and cap have been established, the reimbursement rates will be "updated" each year "by the Medicare update factor for hospitals and units exempt from the Medicare prospective payment system." 32 C.F.R. § 199.14(a)(2)(iv)(C). The regulations further provide that "[h]ospitals and units with hospital-specific rates will be notified of their respective rates prior to the beginning of each Federal fiscal year." *Id.* This provision also states that, once the base period per diems and cap were established, there would be no additional updates for federal fiscal year 1989. *Id.* Plaintiffs' contend that defendant violated this regulation in retrospectively recalculating the $629 cap to $614 for fiscal year 1989. *See* Pls.' Mem. in Supp. of Mot. for Summ. J. at 15.

The Court declines to view the reach of this rule as rigidly as do plaintiffs. While defendant did alter the base period cap

---

**13.** Although plaintiffs do not expressly claim entitlement to judicial review under § 702 of the APA, their Second Amended Complaint for Declaratory, Mandamus and Injunctive Relief does request this Court to review defendant's actions in accordance with APA § 706. Because this case involves review of administrative agency action, and because plaintiffs have invoked the APA, the Court believes that consideration of plaintiffs' claims in light of § 702 is proper.

after January 1, 1989, which had the effect of revising the fiscal year 1989 cap downward to $614 (including the Medicare update factor), the Court does not believe that this revision is precluded by section 199.-14(a)(2)(iv)(C) of the CHAMPUS rules. That regulation concerns the prospective application of the Medicare update factor to the base period per diems and cap on an annual basis: *that* is the updating to which the provision is addressed. The Court does not read "update" to mean that, once OCHAMPUS initially calculated the base period cap, it could *only ever* change that figure by the Medicare update factor. Such a reading of this provision would have the effect, as defendant points out, of rendering the base period cap of $629 "writ-in-stone," even though—as plaintiffs concede—this figure was derived from faulty data.[14] Not only is such an interpretation of section 199.14(a)(2)(iv)(C) unsupported by the language of that provision, it flies in the face of the "Congressional policy of limiting the ever-increasing prices which psychiatric hospitals charge to the government" upon which the CHAMPUS regulations are predicated. *Healthcare San Antonio,* 750 F.Supp. at 14.

### 6. *Bad Faith*

■ Plaintiffs next claim that the CHAMPUS recalculations were so grossly erroneous as to have been made in bad faith. This claim rests on three contentions. First, plaintiffs argue that the use of fiscal intermediaries to recalculate approximately 44% of the hospital-specific per diems was improper because the FI's relied on their "claims history files," which "often contain inaccurate data," rather than the QRDF data file, and because neither OCHAMPUS and Lewin/ICF reviewed these revised per diems before using them to recalculate the cap. Pls.' Mem. in Supp. of Mot. for Summ. J. at 20–21.[15] Second, the "edit" performed by Lewin/ICF on the QRDF extract data file preliminary to calculation of the "regional" rates for lower-volume CHAMPUS providers was "grossly inconsistent" with 32 C.F.R. § 199.-14(a)(2)(iii)(A), which requires that the regional per diems be determined on all covered charges and all covered days. *Id.* at 23. Third, plaintiffs assert that the recalculation process was generally marred because "no one individual coordinated and verified the various steps in the 'recalculation.'" *Id.*

There is no dispute that there were discrepancies between some FI-calculated per diems and per diems based on the QRDF file. *See* Pls.' Ex. 19. Nor is there a dispute that CHAMPUS officials found some variations in some FI processing on some occasions, requiring FI records to be edited before they were "in synch" with data in the master file. *See* Barnett Dep. at 25–27. Rather, the dispute is over how these discrepancies and variations are to be characterized. Did they so plague the FI calculations as to amount to gross errors? "[A]n agency's data selection and choice of statistical methods are entitled to great deference, and its conclusions with respect

---

**14.** In their Reply brief, plaintiffs argue that they "do not contend that this provision prevents defendant from ever correcting inaccurately calculated rates, simply that the hospitals must be notified of the new rates prior to the beginning of the federal fiscal year in which they are to be implemented." Pls.' Reply at 3. Given that the deficiencies in the base period per diems and cap were discovered only *after* January 1, 1989, and given that plaintiffs' objection, as stated in their Memorandum in Support of their Motion for Summary Judgment at 15, was directed at the adjustment of the cap for fiscal year *1989,* it is hard to see how this is much of a response to defendant's characterization of plaintiffs' position.

**15.** The use of fiscal intermediaries to undertake these recalculations, it will be recalled, related

to the decision of some hospitals to seek review of their base period per diems pursuant to a review provision in the CHAMPUS regulations. This regulation provides that

> [a]ny hospital or unit which believes OCHAMPUS calculated a hospital-specific per diem which differs by more than $5.00 from that calculated by the hospital or unit may apply to the Director, OCHAMPUS, or a designee, for a recalculation. The burden of proof shall be on the hospital.

32 C.F.R. § 199.14(a)(2)(ii)(C). When a hospital's per diem was recalculated pursuant to this provision, the recalculation was done by a fiscal intermediary using its own data rather than data from the deficient UB–82 file.

to data and analysis need only fall within a 'zone of reasonableness.'" *Reynolds Metals Co. v. United States Environmental Protection Agency*, 760 F.2d 549, 559 (4th Cir.1985) (quoting *Hercules, Inc. v. Environmental Protection Agency*, 598 F.2d 91, 107 (D.C.Cir.1978), other citations omitted). In explaining the "zone of reasonableness" concept, our court of appeals has stated that one of its principal rationales is that "it frees the court from the minutiae of particular calculations, and correspondingly, it allows an agency discretion to adapt a general formula or methodology to the aspects of a particular case." *Hercules*, 598 F.2d at 107.

The Court has carefully examined every reference in the record cited by the parties pertaining to alleged errors in FI-calculated per diems. On the basis of this review, the Court is satisfied that the use of FI-calculated per diems was reasonable, not the least because these calculations were not based upon the deficient UB–82 file. Moreover, the Court finds no evidence in the record to support plaintiffs' contention that "the FI's 'claims history files' *often* contained inaccurate data." Pls.' Mem. in Supp. of Mot. for Summ. J. at 21 (emphasis added). The deposition testimony cited by plaintiffs in support of that proposition shows instead that, if there were "errors" or discrepancies in calculating the per diems, these were infrequent, and their accuracy improved by OCHAMPUS during the administrative review process. *See* Barnett Dep. at 26, 105; Regensberg Dep. at 24; Pls.' Ex. 19. The Court is satisfied, therefore, that these alleged "errors" fall well within the zone of reasonableness as defined in *Hercules, Inc. v. EPA. See* 598 F.2d at 107.

■ Plaintiffs' next example of gross error pertains to the per diems for hospitals with lower numbers of CHAMPUS patients. In contrast to the hospital-specific per diems paid to high-volume hospitals, low-volume hospitals are reimbursed on the basis of a regional per diem. *See* 32 C.F.R. § 199.14(a)(2)(iii). In calculating regional per diems, according to its regulations, OCHAMPUS must make adjustments for the effects of area wages, and for indirect medical costs. *See* 32 C.F.R. § 199.-14(a)(2)(iii)(C). OCHAMPUS must also reimburse low volume hospitals "for actual direct medical education costs associated with services to CHAMPUS beneficiaries." 32 C.F.R. § 199.14(a)(2)(iii)(D). Once these adjustments are made, the regional per diem amount is to be calculated according the following formula: "[e]ach regional per diem amount shall be the quotient of *all* covered charges divided by *all* covered days of care, reported on *all* CHAMPUS claims from lower volume hospitals in the region paid during the base period." 32 C.F.R. § 199.14(a)(2)(iii)(A) (emphasis added). Plaintiffs' point out that, in making these "adjustments" or "edits" on the QRDF data file, Lewin/ICF removed some 3,975 records from the regional records. *See* Pls.' Mem. in Supp. of Mot. for Summ. J. at 23. It is plaintiffs' contention that the removal of these records is "grossly inconsistent" with the regulations' command that regional per diems be based on *all* covered charges and *all* covered days. *Id.*

Plaintiffs simply misread the regulation. The regulation expressly and unambiguously states that the calculation of regional per diem amounts is to occur *"after having standardized* for indirect medical education costs and area wage indexes and subtracted direct medical education costs." 32 C.F.R. § 199.14(a)(2)(iii)(A) (emphasis added). In other words, the adjustment for these factors is to be undertaken *before* the regional per diems are finally calculated. The use of the term "standardized" implies the elimination of records for which such adjustments are impossible. That is what occurred here. The 3,975 records edited out of the regional database were "unmatched" records, "where there was no information available in [the CHAMPUS] provider file to do the direct medical education and indirect medical education adjustments." McCanna Dep. at 158. Indeed, as one deponent testified, "it's not clear from our analysis what those records really are, whether they still are appropriately regional, whether they would have been caught through other edits or not." *Id.* at 87. Plaintiffs do not dispute these

statements; rather, they conclude, from their misreading of the regulation, that the edits amounted to a violation of the governing regulations. Having reviewed the depositions and exhibits, the Court is satisfied that, on the contrary, plaintiffs have failed to identify a violation of the regulations in the calculation of regional per diems.

Plaintiffs' final example of gross error may be disposed of quickly. They contend that OCHAMPUS's recalculation efforts were marred by a "general lack of coordination and verification." Pls.' Mem. in Supp. of Mot. for Summ. J. at 23. Specifically, plaintiffs assert that the CHAMPUS project officer in charge of the recalculation effort "had no contact with the FI's nor did he give them specific instructions," and object to the asserted absence of "adequate or contemporaneous documentation" of the work of the FIs or Lewin/ICF, which might facilitate the duplication of results. Pls.' Mem. in Supp. of Mot. for Summ. J. at 24. Yet plaintiffs point to no standard, in the governing statute or in the regulations, against which the coordination and verification of OCHAMPUS's efforts is to be measured, and their assertions about the absence of contact between OCHAMPUS officials and private contractors is flatly contradicted by the record. *See, e.g.,* Def.'s Ex. F; Pls.' Ex. 5; Def.'s Ex. VI. As the underlying principles of the APA indicate in the rulemaking context, agencies "retain latitude in organizing their internal organizations." *Batterton,* 648 F.2d at 707 & n. 68. Absent evidence in the record of arbitrary, capricious, and unreasonable conduct on the part of the agency, the court in review is not empowered to second-guess internal agency practices and procedures or impose its own procedures on the agency. *See id.* at 708–09 (discussing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). On review of the record, the Court is satisfied that OCHAMPUS's recalculation of the per diem reimbursement rates was "rational and based on consideration of the relevant factors." *Ethyl Corp.,* 541 F.2d at 36 (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)).

### 7. Calculation of the Deflator for Hospitals that Subsequently Become High Volume Hospitals

The CHAMPUS regulations provide that a hospital not previously classified as a high-volume hospital, which obtained 25 or more CHAMPUS discharges during a federal fiscal year after the base period, is to be reclassified as a higher volume hospital during the next federal fiscal year and all subsequent fiscal years. *See* 32 C.F.R. § 199.14(a)(2)(v)(B). Once reclassified, such a hospital is to receive a hospital-specific per diem in reimbursement, and is subject to the per diem cap, except that

the base period average daily charge shall be deemed to be the hospital's average daily charge in the year in which the hospital had 25 or more discharges, adjusted by the percentage change in average daily charges for all higher volume hospitals and units between the year in which the hospital had 25 or more CHAMPUS discharges and the base period.

32 C.F.R. § 199.14(a)(2)(v)(B). This adjustment is referred to as the "deflator." Plaintiffs contend that defendant's calculation of the deflator was arbitrary and capricious, in that "it appears that the 'deflator' was calculated on the basis of *total* charges, then applied only to *covered* charges," which has the effect of artificially depressing a new high volume hospital's per diem rate. Pls.' Mem. in Supp. of Mot. for Summ. J. at 26. In making this assertion, plaintiffs point to two memoranda prepared by Martin Marietta Corporation at the request of OCHAMPUS, which are attached to defendant's Response to Plaintiff's Interrogatory No. 2, at Tab B. These memoranda describe the system design for the calculation of the deflator. *See* Hogue Decl. ¶ 4. The Court has reviewed these two documents and can find nothing therein to support plaintiffs' assertion. Rather, the memoranda dated February 12, 1990, clearly states, at p. 4, that "[t]he average billed charge per day is calculated by divid-

ing the total billed charges *allowed* by the total hospital days *allowed.*" Ex. B to Def.'s Resp. to Pls.' Interrogs. Plaintiffs do not dispute that this passage means what it says: that the deflator was calculated on the basis of allowed charges, not total charges. Accordingly, the Court is not persuaded that defendant's calculation of the deflator was arbitrary and capricious.

### CONCLUSION

This case presents an example of an administrative agency that made a mistake in interpreting and applying its own recently promulgated regulations, acknowledged its mistake, and undertook corrective measures. These corrective measures were undertaken to ensure that the base period per diems and rate cap, upon which the hospital-specific reimbursement system set forth in 32 C.F.R. § 199.14(a)(2) depends, were calculated as accurately as reasonably possible, so that the system can continue to function in compliance with CHAMPUS regulations and Congress's policy of limiting increases in health care expenditures under the CHAMPUS program. *See* 10 U.S.C. § 1079(j)(2)(A); *Healthcare San Antonio*, 750 F.Supp. at 14. Plaintiffs have sought to show that the agency's attempts to correct its own mistakes were themselves fatally flawed. In reviewing plaintiffs' numerous claims of violations of the APA, it has at times seemed to this Court that plaintiffs insist upon perfection in all respects, and at all stages, of an agency's administrative processes. But perfection is not the standard of review prescribed by Congress in section 706 of the Administrative Procedure Act. Instead, upon review of the record and consideration of the arguments of the parties, this Court is satisfied that defendant's recalculated reimbursement rates constituted a reasonable interpretive rule, that the recalculation process was not arbitrary and capricious in any way causally related to plaintiffs' claims of injury-in-fact, and that in other challenged respects defendant's actions were consistent with the relevant CHAMPUS regulations.

Accordingly, this Court will issue an Order denying plaintiffs' motion for summary judgment, granting defendant's motion for summary judgment, and dismissing the case.